# EXHIBIT A

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA - SACRAMENTO DIVISION


CATHERINE EVON,                  )
                                 )
                                 )
          Plaintiff,             )
                                 )Case No. 2:09-cv-00760-JAM-GGH
                                 )
      vs.                        )
                                 )
LAW OFFICES OF SIDNEY MICKELL,)
SIDNEY MICKELL, ESQ., AND DOES)
1-100, INCLUSIVE,                )
                                 )
          Defendants.            )
_____)



DEPOSITION OF

CATHERINE EVON

400 Capitol Mall, Suite 1100
Sacramento, California  95814


Monday, December 14, 2009


ATKINSON-BAKER, INC.
500 N. Brand Boulevard, Third Floor
Glendale, California  91203
(800)288-3376
www.depo.com

REPORTED BY:  BOBBIE JO HARR, CSR NO. 6090

FILE NO:  A30A77D

9702cd8c-8367-4f28-a239-250f7724ca32

1    Do you also consider her to be your friend?

2    A.   Not especially, no.

3    Q.   Okay.  Are there any people from work that you

4    regularly socialize with?

5    A.   No.

6    Q.   Are there any people at work, other than Amy

7    Davis, with whom you've discussed the law offices of

8    Sidney Mickell?

9    A.   We really didn't have much of a discussion.  She

10   just handed me the letter that they forwarded.

11   Q.   I didn't ask you that, ma'am.

12   Other than Ms. Davis, have you discussed the law

13   offices of Sidney Mickell with anyone at work; yes, no,

14   you don't know?

15   A.   No.

16   Q.   Okay.  And other than Ms. Davis, have you

17   discussed Mr. Mickell's letter of about January 15, 2009,

18   with anyone at work?

19   A.   No.

20   Q.   Do you work today in any specific team group or

21   division at HomEq?

22   A.   I work for accounting for HomEq.  That's our

23   division, within Barclays.

24   Q.   Okay.  Other than the people you supervise, are

25   there any fellow workers that you work with in that

9702cd8c-8367-4f28-a239-250f7724ca32

1        Q.   -- do you work with lawyers?

2        A.   No.

3        Q.   And that may include Amy Davis.

4        A.   No.

5        Q.   Okay.  So you've never had any contact with any

6 lawyers except the contact you may have had with Amy Davis

7 concerning Mr. Mickell's firm's letter to you; is that

8 correct?

9        A.   That's correct.

10       Q.   Okay.  I think I asked you this, but I'm just

11 going to ask you one more time to be sure.

12      Have you ever operated as a debt collector from the

13 time you were hired by the Money Store to today?

14       A.   No.

15       Q.   In the course of your employment, have you ever

16 read any court judgment?

17       A.   Judgment.

18      One may have come across my desk recently, but I did

19 not read it.

20       Q.   Okay.  Do you know what a court judgment is?

21       A.   Yes.

22       Q.   What is a court judgment, in your understanding?

23       A.   It's when somebody is -- is sued and there's a

24 judgment saying that this party is entitled to certain

25 things.

1    Q.   Okay.  Would it be fair to summarize your

2  understanding of what the term judgment is to mean the

3  following:  It's the final decision of the court?

4    A.   Yeah, that's my understanding.

5    Q.   As part of your employment, have you ever come

6  to any understanding about what someone who has obtained a

7  money judgment against another person in California may do

8  to collect it?

9    A.   I don't know how they -- if they get a judgment,

10 I don't know how they can force -- enforce that other than

11 maybe taking them back to court.

12   Q.   Okay.  In any of your employment history, have

13 you ever dealt with wage garnishment?

14   A.   When I was doing payroll at TRW.

15   Q.   Okay.  Tell me what would happen.

16   A.   I would get a letter from human resources.  It

17 was an official document from the court, telling us how

18 much we needed to withhold from that employee's paychecks.

19   Q.   Okay.  And was it your understanding when you

20 worked at TRW, that this followed a judgment or a decision

21 of a court in some fashion?

22   A.   I would suspect that that was true, yes.  Or --

23 most of the time, it was letters from the IRS.

24   Q.   Okay.

25   A.   Very seldom would I see a garnishment itself.

1    Q.   So your testimony is that in all the time you've

2    worked at HomEq and Money Store and HomEq, a part of

3    Barclays, you've never gotten personal mail at work?

4    A.   No.

5    Q.   Okay.  Never gotten a birthday card or a

6    Christmas card?

7    A.   If I do, it's not through U.S. mail.

8    Q.   Okay.  How does -- how do personal

9    communications get to you at work?

10    A.   It's usually within our department.  And, yes, I

11    would get a Christmas card or a birthday card sitting on

12    my desk when I come to work in the morning.

13    Q.   Okay.  Well, if your husband wanted to send you

14    a card at work, how would he do it?

15    A.   He might go into the lobby downstairs and try to

16    figure out a way to get somebody to come out and pick it

17    up and bring it to me.

18    Q.   Do you have an understanding as to why you've

19    never gotten any personal mail at HomEq?

20    A.   I don't like to mix personal business with work.

21    Q.   That's your policy?

22    A.   Pretty much.

23    Q.   Okay.  Other than the fact that you don't want

24    to get personal mail at work, is there any other reason

25    that you have never gotten personal mail at work that you

1    know of?

2         A.    No.

3         Q.    How is United States mail delivered to your

4    facility, if you know?

5         A.    It goes through the mailroom.

6         Q.    Is it physically brought to the mailroom?

7         A.    It's brought to the mailroom on Watt Avenue.

8         Q.    Okay.

9         A.    We have a driver to bring it over to our

10   building.

11        Q.    Okay.  How is mail processed, if at all, on Watt

12   Avenue?

13        A.    In the mailroom.  I don't know their job, so all

14   I can say is that they get the mail and then they process

15   it.

16        Q.    Okay.  When business mail comes to you, do you

17   see on the envelope or on the letter or whatever is

18   contained in the envelope any kind of bar code or notation

19   telling you that the mail has been entered in some system?

20        A.    No.

21        Q.    Is any kind of bar code or other sticker put on

22   envelopes or letters?

23        A.    Occasionally, something will get sent to

24   accounting, and I'm usually the person that gets

25   everything.  And if it's been to the Watt Avenue location,

Page 93

1        Q.   How many people work in the mailroom?

2        A.   I honestly don't know.  I -- I've seen a few

3    people.  I don't know.

4        Q.   Okay.  What time each day is mail delivered to

5    your building, if you know?

6        A.   It's usually delivered -- delivered twice, I

7    believe, at about 10:00 in the morning and 3:00 in the

8    afternoon.

9        Q.   Okay.  Has your employer ever had a written

10   policy prohibiting employees from receiving personal mail?

11       A.   Not that I'm aware of.

12       Q.   Has it had such a policy in any format or form?

13       A.   We have policies stating not to use company

14   assets for personal use.

15       Q.   Okay.  My question was more specific.

16       Has your company -- does your company have a policy,

17   in writing or otherwise, prohibiting its employees, such

18   as you, from receiving personal mail at work?  Yes, no, I

19   don't know?

20       A.   I don't know.

21       Q.   Okay.  Has anyone ever told you that your

22   employer has such a policy?

23       A.   No.

24       Q.   Okay.  Does your employer maintain its policies

25   for employees in written form?

Page 94

1      A.    It's not -- we don't get hard copies.  It's on

2  our intranet we have policies.

3      Q.    All right.  Does anybody ever print out the

4  pages of the policies and put them into a manual book or a

5  policy book of some kind?

6      A.    We don't get a manual.

7      Q.    So all the policies are accessible on-line; is

8  that correct?

9      A.    Yes.

10     Q.    If I wanted to view those policies, what would I

11 look for?  In other words, what information would I put

12 into the computer?  Where would I go on the internet to

13 find it?

14     A.    I would go to the policy manual.

15     Q.    Okay.  Have you ever been counseled, reprimanded

16 or otherwise disciplined for receiving personal mail at

17 work?

18     A.    No.

19     Q.    Have you ever counseled, reprimanded or

20 disciplined anyone at work for receiving personal mail?

21     A.    No.

22     Q.    And just to be certain of this, are you saying

23 that prior to the receipt of Mr. Mickell's firm's letter

24 to you in January of this year, you had never, since your

25 first day at the Money Store, ever received any personal

1   you, there could be garnishment; is that correct?

2       A.   Not necessarily the garnishment, just the

3   embarrassment of, you know, contacting my employer.  I

4   didn't want any more -- any further communication to my

5   boss -- to my place of employment.

6       Q.   So you're saying you filed for bankruptcy

7   because you were afraid that Mr. Mickell's firm would

8   contact your employer again after January 15, 2009?

9       A.   Well, not only that, I just --

10      Q.   That's a yes or no, ma'am.  You have to first

11  answer the question.

12      A.   Okay.  Fine.

13      Q.   Are you saying that you filed for bankruptcy on

14  June 18th, 2009, because you feared a second written

15  communication from Mr. Mickell's firm?

16      A.   Yes, I did.

17      Q.   I see.  That made all the difference in filing

18  for bankruptcy?

19      A.   No, it did not.

20      Q.   Okay.  What were the other reasons you filed for

21  bankruptcy?

22      A.   The threat of litigation and having additional

23  fees, costs, wage garnishments, et cetera.

24      Q.   Okay.  Did you think there was something wrong

25  or illicit in the threat of litigation?  Apart -- apart

1   from the fact that it came to you at work and you didn't

2   like that, did you think that Mr. Mickell's firm or his

3   client didn't have the right to threaten litigation?

4       A.   They could threaten a litigation.  However, I

5   would think that that would need to come certified mail.

6       Q.   Okay.  You're almost answering my question.

7       Did you think there was something wrong about

8   threatening litigation, yes or no?

9       A.   No, I didn't think there was anything wrong with

10  that.

11      Q.   Okay.  And did you think there was something

12  wrong in threatening wage garnishment after a judgment

13  against you, yes or no?

14      A.   If there's a judgment, no, I do not.

15      Q.   Okay.  And did you think there was something

16  wrong in threatening asset seizure after a judgment

17  against you, yes or no?

18      A.   No.

19      Q.   Did you think there was something wrong in

20  threatening taking bank assets you might control after a

21  judgment, yes or no?

22      A.   No.

23      Q.   But your complaint, in part, was that

24  Mr. Mickell's letter didn't come certified mail?

25      A.   My complaint is that it came to my place of

1   payments?

2        A.   No.   He -- he kind of said a thousand is

3   probably the beginning.

4        Q.   Okay.   Is there anything else that you think was

5   omitted from this recording?

6        A.   I cannot think of anything at this time.

7        Q.   Okay.   So let me just make sure I can summarize

8   this correctly.

9        You believe you told Jeremy about the health problems

10  your sister had been having, trips you had been made --

11  you had made to southern California earlier that year, and

12  the financial strain that that was causing your family,

13  correct?

14       A.   Yes.

15       Q.   Okay.   Is there anything else you specifically

16  remember happening in that call that wasn't in the

17  recording you recently listened to, besides that?

18       A.   The fact that I had told him that I thought that

19  I could pay $50 a month.

20       Q.   Okay.   So is your theory that somebody erased

21  that from the call?

22       A.   I don't know what happened to it.

23       Q.   Okay.   Do you remember Jeremy more than once in

24  that call saying he was having trouble listening or

25  hearing you?

9702cd8c-8367-4f28-a239-250f7724ca32

Page 155

1      A.   He may have.   I don't know.   I was on my cell

2   phone.

3      Q.   Uh-huh.   Was the spot -- was the reception

4   spotty?

5      A.   I don't think so.   I -- again, I don't know.

6      Q.   Were you home or were you at work --

7      A.   I was sitting --

8      Q.   -- or were you driving?

9      A.   I was sitting in the parking lot of my bank.

10      Q.   Okay.   After you spoke to Jeremy, did you get

11   more messages from Mr. Mickell's firm?

12      A.   I don't know.

13      Q.   Excuse me.   When you spoke to Jeremy, were you

14   already considering bankruptcy?

15      A.   No.

16      Q.   How did the subject of bankruptcy arise, in your

17   house?   Did you -- was it your husband's idea?   Was it

18   your idea?   Was it some other person's suggestion?

19      A.   My husband had mentioned it on several occasion.

20   I kept pushing back, telling him no, I didn't want to go

21   down that road, and that I wanted to try to pay my bills.

22      Q.   Okay.   Did your husband make you aware of any

23   calls to the house that were made in October?

24      A.   I don't know what month.   There was a call from

25   Ray Welsh.   I have no idea what month that was.

1       Q.    Okay.  Did your husband make you aware of any

2   other calls besides those that might have been placed by

3   Mr. Welsh?

4       A.    No, he didn't make me aware of anything.

5       Q.    Is it fair to say that you have no recordings of

6   any messages that my client's office may have left on your

7   home answering machine?

8       A.    It's fair to say that.

9       Q.    Okay.  And do you have any recordings anywhere

10  of any calls from or with my client's firm?

11      A.    Other than the one that I have in e-mail, no, I

12  do not.

13      Q.    Okay.  So you don't have any micro cassettes or

14  other tapes on which you placed recordings to your

15  answering machine or your work number or anything like

16  that?

17      A.    No.

18      Q.    Okay.  Do you have any information as to when my

19  client decided to file a lawsuit against you on behalf of

20  its client?

21      A.    I -- when I -- I think my husband did mention a

22  call, now that I think about it, where they had mentioned

23  something about litigation.

24          And that it's been -- it might have been my

25  conversation with them, where they said that they had

1     filed a litigation with Yuba County.

2          Q.   Okay.  Have you or anyone, to your knowledge,

3     looked at the court records in Yuba County or anywhere

4     else so to see if a lawsuit was filed?

5          A.   I have not.  I'm just going off of what Ray

6     Welsh told me.

7          Q.   So now you believe Mr. Welsh told you?

8          A.   It was Mr. Welsh.

9          Q.   Okay.  What did Mr. Welsh tell you and when did

10    he tell you?

11         A.   Right before I filed Chapter 13.

12         Q.   Okay.  So sometime in the spring of 2009; is

13    that your testimony?

14         A.   Somewhere around there.

15         Q.   Okay.  But you have not bothered, as of today,

16    to see if any lawsuit was ever filed?

17         A.   No.  Because I filed Chapter 13, if it had been,

18    and I would be able to just tell them, hey, you know, we

19    filed Chapter 13.

20         Q.   Is it your testimony, ma'am, that as of the time

21    you filed for bankruptcy, only the law offices of Sidney

22    Mickell had communicated with you in writing or orally

23    that litigation against you or your husband was a

24    possibility?

25         A.   When you get a collection letter, you're going

1    to get some kind of threat.

2         Q.   Answer the -- ma'am, please answer the question.

3    I'm not asking for commentary.

4         A.   Yes, I -- I've received other letters.

5         Q.   And did those other letters from creditors,

6    having no connection to my client, mention the possibility

7    of litigation against you, yes or no?

8         A.   Yes.

9         Q.   Okay.  How many such letters did you receive --

10        A.   I have --

11        Q.   -- other than those that you attribute to my

12   client?

13        A.   I don't know.

14        Q.   More than ten?

15        A.   Probably.

16        Q.   More than 20?

17        A.   I don't know.

18        Q.   More than 50?

19        A.   I doubt that.

20        Q.   Ma'am, isn't it true that pretty much every

21   creditor and debt collector who has dealt with you in the

22   last two years has sent you at least one letter mentioning

23   that litigation is a possibility if you don't reach a

24   suitable accommodation with them?

25        A.   Not all of them because --

1      to call your employer"?

2              A.   I remember him saying --

3              Q.   Yes or no, ma'am?  It's just yes or no.

4              A.   Yes.

5              Q.   Okay.  And did -- was it your state of mind, at

6      that point, that you had given him an instruction broader

7      than don't call your employer?

8              A.   I told him not to contact --

9              Q.   That's a yes or no, ma'am.  Yes or no.  Did you

10     give him instruction broader than what I said --

11             A.   No.

12             Q.   -- namely, "Don't call my employer"?

13             A.   I didn't give him anything broader, no.

14             Q.   Okay.  So all you said to him was "Don't call my

15     employer"?

16             A.   "Don't contact my employer."

17             Q.   Okay.  Well, he said don't call, right?

18             A.   Yeah.

19             Q.   Do you see that?  Did you see that, ma'am?

20             A.   Yeah, I see it.

21             Q.   Okay.  And do you see where he acknowledges what

22     he -- what you told him by saying, I -- "That's okay.  I

23     don't have to call your employer."

24             Do you see that?

25             A.   Yes, I do.

1          Q.   Okay.  Did it occur to you, ma'am, that he

2     hadn't heard everything you said, that he thought you were

3     telling him not to call, as in make a telephone call, but

4     that he had not heard you instruct him not to send

5     anything to the employer?

6          A.   No.

7               MS. SHAPIRO:  Objection, speculation.

8               THE WITNESS:  No, I didn't.

9               MR. DAHLBERG:  Q.  Did that occur to you

10    or did it not?  Answer the question, ma'am.

11         A.   No, it didn't occur to me.

12         Q.   Okay.  Do you understand, in looking at this

13    transcript, that he was acknowledging a narrower

14    instruction from you, namely, do not call, and that you

15    think you had told him do not send, which is broader than

16    do not call?

17         A.   No.

18         Q.   You didn't understand that?

19         A.   No, I did not.

20         Q.   So when you -- you think that calling and

21    sending are the same thing?

22         A.   No, I don't.

23         Q.   Okay.  How are they different?

24         A.   Well, how are they different?

25         Q.   Okay.  Doesn't call mean telephone call?

1          A.    Yeah.  And I said do not contact my employer.

2          Q.    Okay.  And he repeated back to you, okay, I

3    don't want -- okay.  "That's okay.  I don't have to call

4    your employer."

5          Do you understand that he was talking about call and

6    that you had earlier talked about send?  They're

7    different?

8          A.    It's a play on words, yeah.

9          Q.    Do you understand they're different?

10          A.    Yes, yes.

11          Q.    Okay.  Send could mean do not send a letter, for

12    example, correct?

13          A.    Uh-huh.

14          Q.    Okay.  Does the instruction, do not call my

15    employer -- I'm sorry.  You said uh-huh.  You have to

16    answer --

17          A.    Yes.

18          Q.    All right.  Do you understand that to call means

19    to telephone call?

20          A.    Yes.

21          Q.    Okay.  If you say to somebody, don't call me at

22    work, that doesn't mean they may not send you a letter at

23    work, does it?

24          A.    I suppose.

25          Q.    Okay.  And so did you understand that he

9702cd8c-8367-4f28-a239-250f7724ca32

Page 195

1      A.   No.

2      Q.   Okay.  Ma'am, looking also on page 7, the person

3   identified as manager says, "I can't force you to pay your

4   bill, but we're local to you here in California.  I don't

5   have to call you and I -- I can't call you at work because

6   you told me not to."

7      Ma'am, why didn't you correct him at that point and

8   say, not only did I tell you you can't call me at work,

9   but also that you can't send anything to me at work?

10     A.   I wasn't in the state of mind at the time to --

11   to say -- I mean, I had told him not to contact my

12   employer.  I would expect that that would encompass

13   sending, calling, e-mailing, faxing, whatever.

14     Q.   Okay.  Ma'am, did it occur to you that he gave

15   you back the instruction there, as he understood it from

16   you, namely, that he wasn't to call, but that he wasn't

17   prohibited from sending?

18     A.   It did not occur to me.

19     Q.   Okay.  Do you see further in that paragraph that

20   he suggested reducing your debt down to about $5,000?

21     A.   Yes, I remember that conversation.

22     Q.   Did you view that as a reasonable thing for him

23   to offer when you had offered nothing at all?

24     A.   Anything is reasonable if it's lower than what I

25   owed.

Page 212

1      A.   And he said where.

2      Q.   Uh-huh.

3      A.   I did not like the fact that he was asking me

4  for that information.  But at the time, I felt that he was

5  trying to work with me, and that's why I gave him that

6  information.

7      Q.   Okay.  And what was it you objected to when he

8  tried to verify that you were employed?

9      A.   Because I felt that he was going to try to

10 contact my employer.

11     Q.   You felt that when you were talking to him at

12 the section you've noted on page 3?

13     A.   Page 3, and it goes over into page 4.

14     Q.   Okay.  Why did you think he was going to contact

15 your employer?

16     A.   Because he said he wanted to get verification of

17 employment.

18     Q.   Okay.  And do you know what that means?

19     A.   Yes, I do.

20     Q.   Okay.  It means, basically, that a creditor or a

21 lender wants to know that you're employed so they have an

22 understanding of what you can and can't afford, correct?

23 A lot of people say they're employed and aren't, right?

24     A.   I suppose.

25     Q.   Isn't that one of the problems in the subprime

1  loans that your company deals with, a lot of people said

2  they had income of X, and they had no income?

3      A.   Yes, that's true.

4      Q.   Okay.  So you understand that's a normal thing

5  for either a lender or a debt collector to do, is to find

6  out if you can afford a payment plan which you might

7  otherwise agree to, right?

8      A.   Yeah.

9      Q.   So now that I've explained that to you, do you

10  withdraw your concern that he asked you who you worked

11  for?

12      A.   It hasn't helped my concern, because there was a

13  letter delivered to my employer.  So that doesn't help.

14      Q.   That was in January, ma'am.  This called

15  happened in September, right?  We're talking about what

16  happened then.

17      A.   Okay.  Moving on.

18      Q.   Ma'am, no, I need an answer to the question.

19      A.   What do you want?

20      Q.   Okay.  We'll get the question read back to you.

21  The question was -- okay.  The question -- the gist of the

22  question was now that we've reviewed that it's a normal

23  thing in business to get verification of employment, do

24  you have any complaint that on September 30, Jeremy asked

25  you for information about your employment?

Page 228

1     A.   No, I didn't.

2     Q.   Okay.  At any time, did you ever tell anybody at

3 Mr. Mickell's firm, after you spoke to Jeremy, anything

4 about your financial condition, whether they placed the

5 call or you placed the call?

6     A.   I don't remember.

7     Q.   After you spoke with Jeremy, did anyone from

8 Mr. Mickell's firm ever call you at work?

9     A.   No.

10    Q.   And the call with Jeremy was September 30, 2000

11 (sic), correct?

12    A.   I believe that was the date.  I don't know for

13 sure.

14    Q.   Okay.  But just so we're clear, the call that is

15 memorialized in Exhibit 3, that was the last -- I'm sorry.

16 Strike that.

17    After you had the call memorialized in Exhibit 3, no

18 one from Mr. Mickell's firm ever telephoned you at work,

19 correct?

20    A.   No, they did not.

21    Q.   I'm correct, is that right?

22    A.   That's correct.

23    Q.   Okay.  Do you remember a call in early October

24 with anybody from Mr. Mickell's firm?

25    A.   I don't remember.

9702cd8c-8367-4f28-a239-250f7724ca32

Page 233

1   envelope or something else?

2        A.   It was in the envelope.

3        Q.   It was in the envelope?

4        A.   Yes.

5        Q.   All right.  Was the envelope open or was it

6   sealed?

7        A.   It was open.

8        Q.   Okay.  What conversation, if any, did you have

9   with Ms. Davis at this time?

10       A.   I just said I got an e-mail from you, do you

11  have something for me?  And she gave it to me and she

12  said, I'm sorry, I thought it was business related and

13  that's why it was opened.

14       Q.   Okay.  Did she give you any understanding as to

15  who opened it?

16       A.   She did not.  It was somebody in legal.

17       Q.   Okay.  Do you know who?

18       A.   Most likely her or her admin.

19       Q.   Okay.  I'm not asking you to guess or speculate.

20  When I say know, it means know.

21       Do you know who opened it, yes or no?

22       A.   I don't know specifically.

23       Q.   Okay.  Has anything been said to you from which

24  you can form a reasonable opinion as to who opened it?

25       A.   I believe it was Amy, because her admin was not

9702cd8c-8367-4f28-a239-250f7724ca32

Page 234

1    there.

2         Q.   Okay.  So when she gave you the letter back, it

3    was inside a sealed envelope; is that correct?

4         A.   It wasn't sealed.

5         Q.   You're right, I'm sorry.  An opened envelope?

6         A.   Yes.

7         Q.   Okay.  Was the envelope opened at the flap or

8    was the top of the envelope slitted open?

9         A.   It was slit open.

10        Q.   Okay.  All right.  And when she handed you the

11   letter in the envelope, could you read the outside of the

12   envelope?

13        A.   I saw my name in a window envelope.  I don't

14   recall anything on the left-hand side of it, as you said.

15        Q.   Okay.  When you saw your name in the window in

16   the envelope, did you also see the words, in capital bold,

17   personal and confidential?

18        A.   Yes, I did see it.

19        Q.   Okay.  All right.  Did you have any other

20   conversation with Ms. Davis on that occasion about this

21   letter or its contents?

22        A.   She again -- she said she's sorry that she had

23   opened it, and that she didn't realize that it was

24   personal, and it was in the legal -- as the mailroom had

25   saw that it was from a law office and automatically put it

1    into the legal basket.

2         Q.   Okay.  Did she tell you that or is that a

3    conclusion that you drew?

4         A.   She said it was in their basket.

5         Q.   Okay.  But she didn't tell you who put it there?

6         A.   She didn't tell me who put it there, no.

7         Q.   Okay.  Did she tell you if the mailroom had

8    opened the envelope?

9         A.   She did not tell me that.

10        Q.   And you don't know who opened the envelope?

11        A.   I believe it was her.  She -- she told me "I'm

12   sorry, I didn't realize it was personal and confidential."

13        Q.   Okay.  And so from that, you deduced that she

14   opened the envelope as well as read the letter?

15        A.   Yes.  I know she read the letter.

16        Q.   Sure, because she told you, "I'm sorry, I didn't

17   realize this was personal."

18        A.   I knew she read it.

19        Q.   For the reasons I've stated, correct?

20        A.   She was asking her senior paralegal to look

21   information up on the law office of Sidney Mickell --

22        Q.   Ma'am, I'm sorry.  You've got to be specific

23   about the evidence you're talking about.

24             You're talking now about an e-mail that Ms. Davis

25   sent on the 20th of January to various people; is that

1    Q.   Okay.  All right.  Basically, did you understand

2    her, in effect, to be apologizing to you for having opened

3    your mail?

4    A.   She was apologizing, that's correct.

5    Q.   Okay.  And was there anything else that the two

6    of you discussed at that time which you can recall?

7    A.   Yeah.  When we win the lottery.

8    Q.   What's that?

9    A.   If and when we win the lottery.

10   Q.   Tell me what was discussed about winning the

11   lottery.

12   A.   Just she -- we always joke around with each

13   other, and we just say, yeah -- because I'm the jackpot

14   captain at work.

15   Q.   What does that mean, jackpot captain?

16   A.   I collect the money from people that are

17   playing, and I go buy the tickets, and we joke around

18   about what we're going to do with the money.

19   Q.   Okay.  Did she make a remark about winning the

20   lottery in connection with the contents of the letter or

21   was this just one of her remarks about you and the lottery

22   and you being the jackpot captain?

23   A.   No, it was just joking around.  It had nothing

24   to do with the letter.

25   Q.   Okay.  All right.  Anything else that you and

9702cd8c-8367-4f28-a239-250f7724ca32

1   Ms. Davis discussed?

2          A.   I can't recall anything else.

3          Q.   Okay.  And did you meet in her office?

4          A.   I did.

5          Q.   Did you sit down?

6          A.   I don't remember sitting down.  I think I stood

7   in her doorway, and she just handed me the letter.

8          Q.   Okay.  And then you had this extended several

9   minutes conversation with her while you continued to stand

10  in the doorway?

11         A.   Yeah.

12         Q.   Okay.  And you can recall nothing else she said

13  or you said other than what you've just given me?

14         A.   Can't recall anything else.

15         Q.   Okay.  When you left her office that day, had

16  anyone said to you anything along the lines of your job is

17  in jeopardy or you're in trouble at work or anything like

18  that?  That's a yes or no question.

19         A.   No.

20         Q.   Okay.  Have you had any other conversation with

21  Ms. Davis about the letter from Mr. Mickell dated

22  January 14, 2009, or its contents at any time?

23         A.   No, I did not.

24         Q.   Okay.  To your knowledge, has your attorney

25  interviewed Ms. Davis?

Page 239

1      A.   I don't know.

2      Q.   Okay.  Has anyone working for any of your

3  attorneys contacted Ms. Davis?

4      A.   I don't know.

5      Q.   Okay.  Have you discussed the letter or its

6  contents with anyone at your workplace other than

7  Ms. Davis at any time?

8      A.   No.

9      Q.   Okay.  Did you receive any written warnings or

10 reprimands or counseling from anyone at your job at any

11 time concerning the January 14, 2009, letter or its

12 contents?

13     A.   No.

14     Q.   Is it fair to say that you have never received

15 any kind of discipline on account of the letter or its

16 contents?

17     A.   That's correct.

18     Q.   Okay.  Have you ever had a fear that you would

19 face some kind of adverse job action such as discipline,

20 reprimand, et cetera, because of the letter or its

21 contents?

22     A.   Not because of the letter.

23     Q.   Or its contents?

24     A.   Possibly its contents.

25     Q.   Okay.  And what specific facts do you point to

Page 242

1    I have to do an attestation once a year for the code of

2    conduct, and I'm going to have to disclose that I filed

3    Chapter 13.  And I started thinking about that bond thing,

4    and that's probably what they do, is they bond people.  So

5    I think I'm going to have an adverse action come January

6    or February.

7         Q.   Okay.  But you're speculating right now,

8    correct?

9         A.   I'm speculating, but I -- I truly believe that

10   there may be some problems.

11        Q.   Okay.  Well, are -- Mr. Mickell didn't make you

12   file for bankruptcy, did he?

13        A.   This letter is what made me decide to go file

14   bankruptcy, that's correct.

15        Q.   Okay.  Ma'am, you filed for bankruptcy on

16   June 18th, correct?

17        A.   I had started --

18        Q.   Yes or no, is that correct?

19        A.   Yes.

20        Q.   All right.  And the letter is dated January 14,

21   some six months earlier; is that correct?

22        A.   Yes.

23        Q.   Okay.  So you're saying that this letter led to

24   a bankruptcy filing six months later?

25        A.   Yes, I do.

1    and care.  Do you have it in front of you?

2          First of all, you see that the words personal and

3    confidential are reproduced in bold faced capitals

4    immediately to the right of your name, correct?

5          A.   Yes, I do.

6          Q.   And when the letter was put in the envelope,

7    according to the fold marks on it, the words personal and

8    confidential plainly show, don't they?

9          A.   Yes.

10         Q.   Okay.  So when Ms. Davis handed you that letter

11   in her office, you could plainly see on the envelope the

12   words, quote, Catherine Evon, personal and confidential,

13   closed quote, on the top line in the window, right?

14         A.   Yes.

15         Q.   Okay.  There's information beneath that with

16   regard to CACH and Maryland National Bank.

17         Do you see that?

18         A.   Yes, I do.

19         Q.   At any time, have you looked at that information

20   and attempted to cross-reference it to Wachovia Bank or

21   any other creditor?

22         A.   I did.

23         Q.   Okay.  And what was the outcome of your search?

24         A.   There was one or two -- one or two creditors

25   that I might possibly be able to link that dollar amount

Page 251

1       A.   Yes, it is.

2       Q.   -- in which the letter came; is that right?

3       A.   Yes.

4       Q.   Give me a second to get my questions out before

5 you start speaking.

6       And, again, where is that envelope today?

7       A.   It's at home.

8       Q.   Have you written on that envelope?

9       A.   I doubt it.

10      Q.   How did you find Mr. -- I'm sorry.  How did you

11 find Mr. Lemberg as early as February 10?

12      A.   I went on the internet.  I was pretty upset.

13      Q.   What was it that upset you about the letter in

14 view of the fact that you've said there's nothing in its

15 contents that you think is inaccurate?

16      A.   That it was brought to my employer's attention.

17      Q.   Okay.  And the way it was brought to your

18 employer's attention was the letter addressed to Catherine

19 Evon, personal and confidential, was placed before a

20 lawyer at your firm, correct?

21      A.   That's correct.

22      Q.   In other words, Mr. Mickell's office didn't send

23 a letter specifically to your employer.  They sent a

24 letter to you at your employer on a personal and

25 confidential basis?

9702cd8c-8367-4f28-a239-250f7724ca32

1      A.   That's correct, after I asked them not to.

2      MR. DAHLBERG:  Move to strike everything after

3 the words that's correct.  Nonresponsive.

4      Q.   So you contacted an attorney because you were

5 upset that the letter was sent to your workplace,

6 addressed to you on a personal and confidential basis,

7 correct?

8      A.   That's correct.

9      Q.   Okay.  Is there any other reason that you sought

10 counsel at that time?

11      A.   I asked the law offices of Sidney Mickell not to

12 contact my employer.

13      Q.   Yeah, I understand.  Is there any other reason

14 that you contacted counsel?

15      A.   Yes, there is.

16      Q.   What's that?

17      A.   To have them make these people stop.

18      Q.   Okay.  So is it fair to say that, as early as

19 February 10th, you had decided to sue the law offices of

20 Sidney Mickell?

21      A.   I was pretty upset about it.

22      Q.   My question was, not --

23      A.   Yes, I did.

24      Q.   -- whether you were upset.

25      A.   Yes, I did.

Page 271

1          (Whereupon Exhibit 8 was marked for

2          Identification.)

3          MR. DAHLBERG:  Q.  Okay.  Showing you next

4     in order, an e-mail dated January 25.

5          Do you recognize this exhibit?

6     A.   Yes, I do.

7     Q.   Okay.  And I'm sorry, this is Exhibit 8?

8          THE REPORTER:  (Nods head).

9          MR. DAHLBERG:  Q.  First of all, I notice

10    in the upper left hand and top, another reference

11    February 10, 2009, referencing Tuesday, 13:29, with

12    a fax number.

13         Does this also reflect that you sent this document

14    from your place of employment to Mr. Lemberg?

15    A.   Yes.

16    Q.   Okay.  And, again, that was in violation of firm

17    policy, correct?

18    A.   If you want to put it that way.

19    Q.   Is your answer yes?

20    A.   Yes, it is.

21    Q.   Okay.  And let's see.

22         The first sentence says, "Is it really necessary to

23    contact my employer?"

24         Were you making reference in that sentence to the

25    January 14 letter?

9702cd8c-8367-4f28-a239-250f7724ca32

1       A.   Day or two.

2       Q.   Okay.  So by about January 26 or 27, you had

3 decided to sue?

4       A.   That's right.

5       Q.   Okay.  Had you spoken to any attorney?

6       A.   Not at that time.

7       Q.   Okay.  What was it you were looking for in a

8 lawsuit as of January 26 or 27, 2009?

9       A.   I want them to stop treating people this way.

10       Q.   I see.  And other than that, what else did you

11 want?

12       A.   Nothing more.

13       Q.   Did you want money?

14       A.   I want them to stop treating people this way.

15       Q.   My question was, did you want money?

16       A.   Not necessarily.

17       Q.   So that -- that played no part in your thinking

18 as of that time?

19       A.   No.  I want them to do the right thing.

20       Q.   Okay.  And when you say you wanted them to stop

21 something, what was it exactly you wanted them not to do?

22       A.   Harassing people at their place of business.

23       Q.   Anything else?

24       A.   Not really.

25       Q.   Okay.  Am I correct that the only contact

1   Mr. Mickell's firm had with your business was the letter

2   of January 14?

3       A.   I believe so, yes.

4       Q.   Okay.  And that -- and that alone is the only

5   complaint you had as of January 25, 26 or 27 against

6   Mr. Mickell's firm?

7       A.   Yes.

8       Q.   Okay.  The fact that they sent a letter to you

9   on a personal and confidential basis at your employer?

10      A.   They shouldn't have done it.

11      Q.   Didn't ask you that, ma'am.  Was that your only

12  complaint, yes or no?

13      A.   Yes, it is.

14      Q.   Okay.  Let's suppose the letter had gotten to

15  you in a sealed envelope, and your name and personal and

16  confidential could be read in the window of the envelope.

17  Let's just suppose that hypothetical.

18      Would that also make you upset?

19      A.   Yes, it would.

20      Q.   Okay.  So if nobody else read it except you, it

21  was brought to you and nobody had any idea what was in the

22  letter, why would that upset you?

23      A.   Because they have my home address, they can send

24  me a letter at home.  They don't have to bother me where I

25  work.

9702cd8c-8367-4f28-a239-250f7724ca32

1   office?

2        A.   I didn't -- I don't like -- I just didn't want

3   to do it.  I wanted to send it in writing and have it --

4        Q.   All right.

5        A.   -- sent to them.

6        Q.   You were very critical that the letter you

7   received of January 14 didn't come to you by certified

8   mail, if I recall your testimony.

9        Did you send this by certified mail to anyone?

10        A.   No, I didn't.

11        Q.   Why not?

12        A.   I didn't feel a need to.

13        Q.   Why not?

14        A.   I'm just telling them to leave me alone.

15        Q.   Okay.  You thought this letter was important,

16   right?

17        A.   Yes, I did.

18        Q.   So didn't you want some evidence that it

19   actually was delivered and wasn't lost in the mail?

20        A.   No.

21             (Whereupon Exhibit 9 was marked for

22             Identification.)

23             MR. DAHLBERG:  Q.  All right.  Looking now

24   at exhibit which will be marked as 9.

25        Okay.  Ma'am, do you recognize the document marked as

1   Exhibit 9?

2       A.   Yes, I do.

3       Q.   Okay.  What is it?

4       A.   It's a letter that I sent to the law offices of

5   Sidney Mickell.

6       Q.   Okay.  And why did you prepare this letter?

7       A.   To let them know that they can contact me at

8   home.

9       Q.   Okay.  Did you prepare this letter at -- on your

10   home computer?

11       A.   Yes. I did.

12       Q.   Did you fax it to Mr. Lemberg from your office?

13       A.   Yes, I did.

14       Q.   Again, that was in violation of your company's

15   policy, correct?

16       A.   Yes.

17       Q.   Okay.  Did you send this letter to anyone other

18   than Mr. Lemberg or Mr. Mickell's office?

19       A.   No, I did not.

20       Q.   Okay.  All right.  So you sent this letter on

21   February 10th, 2009.  Is it fair to say that by this time,

22   you were no longer having feelings of stress because of

23   Mr. Mickell's letter sent about a month earlier?

24       A.   I did -- I didn't feel any stress related to

25   that --

1    law firm --

2         A.   Yes.

3         Q.   -- or his client; is that right?

4         A.   Yes, it is.

5         Q.   Okay.  So you received a message from somebody

6    saying we don't want to bother you at work and we do want

7    to find a way to serve legal papers on you; is that a fair

8    summary?

9         A.   Pretty much.

10        Q.   Okay.  So did you call these people back and say

11   okay, here's the way to serve me with those papers?

12        A.   Yes, I did.  I told them I'm home at 6:00 at

13   night, and they can come by anytime.

14        Q.   Okay.  When -- about when did you make that

15   call?

16        A.   I don't know.  Probably mid February.

17        Q.   Okay.  I'll represent to you, ma'am, that the

18   process servers in this case, I understand, will say that

19   you never called them back.

20        Do you know what a process server is?

21        A.   Yes, I do.

22        Q.   Okay.  So how do you account for the fact that

23   these folks, who are independent and neutral, would say

24   that?

25        A.   Somebody said it.  They left it on my voice mail

1    at home.

2        Q.   No.   How can you account for the fact that they

3    would all say that they never got a call back from you?

4        A.   I don't know.

5        Q.   Okay.  You were never actually served with

6    anything at your work by any process server, right?

7        A.   No.

8        Q.   Okay.  And the only thing you ever got at work

9    connected with Mr. Mickell's firm is the January 14

10   letter, correct?

11       A.   Yes.

12       Q.   Okay.  Ma'am, what was the purpose of this

13   February 10 letter exactly?  What were you hoping to

14   accomplish?

15       A.   What was I hoping to accomplish?

16       Q.   Uh-huh.

17       A.   I was basically putting it in writing, because I

18   wanted to document everything, because I felt that, you

19   know, I was -- that was the only way I would have a record

20   of what was said.

21       So I wrote them a letter and I felt that it needed to

22   be done to keep them from bothering me at work.

23       Q.   Okay.  Even as you would admit here that

24   Mr. Welsh offered to find a way to serve you away from

25   work; is that right?

1          A.    That's exactly what I called them for, was to --

2    to have them serve me at home.

3          Q.    Okay.  And you wanted to document here that

4    Mr. Welsh was agreeable with that, in concept, correct?

5          A.    I wanted somebody to --

6          Q.    Is that correct -- ma'am, yes or no?

7          A.    Yes.

8          Q.    Is that correct?

9          A.    That's correct.

10         Q.    Okay.  So if Mr. Welsh said, hey, we'd like to

11   serve you at home, we don't want to bother you at work,

12   please cooperate with us, and you were, in theory,

13   agreeable with that?

14         A.    That's correct.

15         Q.    Okay.  And you can't account for the fact that

16   the process servers that my client's firm may have hired

17   or retained to serve you at home couldn't get ahold of

18   you?

19         A.    I don't know.  I don't know if they tried to get

20   ahold of me.  I don't know if they knocked on my door or

21   whatever.  My husband's there all the time.

22         Q.    Okay.  Did your husband send people away?

23         A.    No, he didn't.

24         Q.    Didn't shew them away?

25         A.    I don't think so.

1    A.   Probably five.

2    Q.   Okay.  Which ones?

3    A.   Capital One would be one.

4    Q.   Okay.

5    A.   Wachovia.

6    Q.   Okay.

7    A.   HFC --

8    Q.   Okay.

9    A.   -- was another.

10   Q.   Okay.

11   A.   I can't think of any other ones.

12   Q.   Okay.  So is it fair to say that you filed

13   bankruptcy not only to prevent Mr. Mickell's client from

14   suing you, but also these others you've just identified

15   such as HFC?

16   A.   It was -- yes, it was to prevent a lawsuit from

17   anybody.

18   Q.   Okay.  Including HFC?

19   A.   Yes.

20   Q.   Including Capital One?

21   A.   Yes.

22   Q.   Including Bank of America?

23   A.   Yes.

24   Q.   Okay.  All right.  So it would be fair to say,

25   then, that if you never heard of Sidney Mickell, if his

1    A.   I hope I'm looking at the right -- the same

2    thing you're --

3    Q.   Paragraph 17, page 4, lines 11 to 14.

4    A.   11 to 14.  See, I'm looking at 17 here, so.

5    Q.   Page 4, lines 11 to 14, approximately.

6    A.   Page 4, 11 -- okay.  So I was looking at the

7    wrong page.

8    Q.   Okay.  Let's take a look at the paragraph.  Tell

9    me if you believe, based on research you've done or

10   experience you've had, that the defendant's letter

11   impermissibly threatened legal action, wage garnishment,

12   bank account levies, attachment of assets and accrual of

13   interest and attorney's fees.  And the key word is

14   impermissibly.

15   A.   Okay.  So what was your question about it?

16   Q.   I've asked it three times.  I'll ask it again.

17   A.   Ask me again.

18   Q.   Is that simply your attorney --

19   A.   I'm getting tired.  Ask me again.

20   Q.   That's okay.  That's fine, ma'am.

21   Is that simply your attorney's work product or is

22   that your personal opinion based on research or experience

23   that you've had and participated in?

24   A.   That's my attorney's.

25   Q.   Okay.  That's not your sentiment one way or the

1    other.  That's your attorney's work, correct?

2        A.    That's correct.

3        Q.    Okay.  Now, paragraph 18, follow along with me,

4    page 4, lines 15 to 16.  Quote:  The defendants stated to

5    plaintiff that the content of the letter was consistent

6    with letters which defendants routinely sent to other

7    California consumers.

8        Okay.  First of all, when did my client's office ever

9    tell you that the January 14 letter was consistent with

10   other letters they had sent to other California consumers?

11       A.    There -- they had spoken to my husband.

12       Q.    Okay.  When did they tell you that?  This says

13   stated to plaintiff.

14       A.    It was on a voice mail.  It -- they said it's --

15   what -- common -- common policy for them to send

16   defendants letters at their workplace.

17       Q.    Ma'am, I'm sorry.  I thought Mr. Welsh's voice

18   mail for you, which we reviewed and which you say your

19   children deleted, said that they served defendants at

20   their workplace with legal papers, not send them letters

21   like the letter summarized in paragraph 16.

22       So are you now saying that you also received a voice

23   mail in which somebody said that the letters like the

24   January 14 letter were commonly sent by Mr. Mickell's firm

25   to other consumers or debtors?  Is that your testimony

A30A77D
**CATHERINE EVON   DECEMBER 14, 2009**

```
 1          REPORTER'S CERTIFICATE
 2
 3      I, BOBBIE JO HARR, CSR No. 6090, Certified Shorthand
 4  Reporter, certify:
 5      That the foregoing proceedings were taken before me at
 6  the time and place therein set forth, at which time the
 7  witness was put under oath by me;
 8      That the testimony of the witness, the questions
 9  propounded, and all objections were recorded stenographically
10  by me and were thereafter transcribed;
11      That the foregoing is a true and correct transcript of
12  my shorthand notes so taken.
13      I further certify that I am not a relative or employee
14  of any attorney of the parties, nor financially interested in
15  the action.
16      I declare under penalty of perjury under the laws of
17  California that the foregoing is true and correct.
18      Dated this 31st day of December 2009.
19
20
21      Bobbie Jo Harr
22      _____
23      BOBBIE JO HARR, CSR No. 6090
24
25
                                    Page 366
```

**ATKINSON-BAKER, INC. COURT REPORTERS**                    1-800-288-3376

# EXHIBIT B

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


CATHERINE EVON,

          Plaintiff,


VS.                                  Case No.
                                  1:09-CV-00760-JAM-GGH

LAW OFFICES OF SIDNEY MICKELL;
and SIDNEY MICKELL, ESQ.; and
DOES 1 through 100, inclusive.

          Defendants.




DEPOSITION OF SIDNEY MICKELL

BURBANK, CALIFORNIA

THURSDAY, MARCH 25, 2010




REPORTED BY:

CAROLYN ANN PETERSON

CSR No. 3195

Page 23

1    A.    I have already answered that -- no, I don't

2 think I have.  I believe it was 1987.

3    Q.    Did you attend law school for three years?

4    A.    Approximately.

5    Q.    Where did you attend law school?

6    A.    Southwestern University -- I think it's called

7 Southwestern University School of Law.

8    Q.    After obtaining your degree from Southwestern,

9 did you apply to the California Bar?

10    A.    I am not 100 percent sure how it worked.  I

11 know that I did apply for the CalState Bar approximately

12 at the time that I ended law school.

13    Q.    Did you pass the bar?

14    A.    Yes.

15    Q.    First time you took it?

16    A.    Amazingly.

17    Q.    After passing the bar, did you obtain legal

18 employment?

19    A.    I'm not trying to avoid your question.

20 Technically, that's not how it worked.

21    Q.    Tell me how it worked.

22    A.    I was a law clerk -- strike that.  Rephrase

23 that.

24          After finishing law school, but before passing

25 the Bar, I was a law clerk.  And then after I took the

517f3755-fc49-40cd-95b9-ea039130fa19

1     A.    Yes.

2     Q.    How do you know when -- how do they know when

3  they expend money?

4     A.    I report to them.

5     Q.    Oh.  Now, I want to make sure I understand

6  something:  That's the way your law office On-Notice

7  screen works?

8     A.    Sure.

9     Q.    Now, as I understand it, based on the documents

10  that I have read, the On-Notice screen is set up for the

11  purpose of alerting collectors when a consumer notifies

12  the law office that communication is not to be sent or

13  the consumer is not to be called at a certain place?

14     A.    Well, I think that's right.  In all honesty, I

15  can't tell you what was going on in somebody's head when

16  they designed it, but I can tell you what I use it for.

17     Q.    Go ahead.

18     A.    And that's exactly so.

19     Q.    Okay.

20     A.    And I assume that is what it was designed for.

21     Q.    And when a collector has occasion to use the

22  On-Notice screen, there are three boxes that the

23  collector can check?

24     A.    No.

25     Q.    How many boxes are there?

1      A.    Four.

2      Q.    Okay.  Can you tell me what those four are?

3      A.    Of course.  There is -- I might be getting the

4  terms slightly wrong, but I'm essentially correct.

5            There's a written box and a verbal box, and

6  there is a home box and a work box.

7      MR. SEVILLA:  Before you say anything further, I

8  just want to put an objection on the record that it is

9  proprietary information, and I object on that basis, but

10  you can complete your answer.

11      MR. LEMBERG:  Mr. Sevilla, to whom is the

12  information proprietary?

13      MR. SEVILLA:  It's proprietary information.  I'm

14  not going to say by who.  You can ask -- you have asked

15  about that information.

16  BY MR. LEMBERG:

17      Q.    When you said you are not sure what the boxes

18  are called, how frequently do you have occasion to click

19  on the on-notice screen?

20      A.    I can only say very often.

21      Q.    And as I understand it, sometimes people say,

22  "Don't call me at home" or "Don't call me at work, don't

23  write to me in a certain place."

24            And if those instructions are given, the

25  checkmarks -- the boxes should be checked, correct?

1    A.   Yes.

2    Q.   Generally.  Okay.

3    A.   When you say "should," are you talking about

4  law, policy?  I'm not sure what you mean by that.

5    Q.   It is the policy of your law office to do that?

6    A.   Yes, absolutely.

7    Q.   Okay.  Now, I picked up from the expert report

8  that there are four specific instructions that your law

9  office has a policy of following and marking off on the

10 On-Notice screen.

11   MR. SEVILLA:  Objection.  The document speaks for

12 itself.

13   THE WITNESS:  I'm trying to answer your question.

14 BY MR. LEMBERG:

15   Q.   Well, what I'm trying to do is --

16   A.   Are you asking what the report says or so --

17 I'm happy to answer the question, but I'm not sure where

18 you are going.

19   Q.   Now, if a consumer says to a collector, "Do not

20 call me."  Okay?  Strike that question, please.

21        If a consumer says, "Do not call me at work."

22 Okay?  Those are the specific instructions.  Then the

23 collector checks off "work" and then "verbal," correct?

24   A.   Yes.

25   Q.   Okay.  The "letter" box is then left blank?

1      A.    I'm not sure what you mean by "letter box."

2            Oh, oh, I know what you are saying.  You are

3      saying the box that says "letter."  I gotcha.

4            It may say written, but I just don't remember

5      exactly what it says.  But yes, if they pay, "Don't call

6      me at work," they would check off the "call" box and the

7      "work" box.

8      Q.    Okay.  So the interpretation that is given to

9      that instruction by your law office is that "Do not call

10     me," does not mean do not write?

11     A.    I will answer this question exactly as you put

12     it.  That is correct.

13     Q.    Therefore, unless a person says to the

14     collector, "Do not write me at work," the policy is we

15     can go ahead and do it.  Is that basically right?

16           MR. SEVILLA:  I object.  That mischaracterizes the

17     evidence.

18           THE WITNESS:  That wouldn't be an accurate

19     statement of policy.

20     BY MR. LEMBERG:

21     Q.    Would that be an accurate statement of policy

22     with respect to the instruction, "Do not call me at

23     work"?

24     A.    If they say, "Do not" -- if a consumer says,

25     "Do not call me at work," the policy is to check off the

1    "do not call" and the "work" box.

2        Q.    Is there a policy with respect to inquiring

3    from the consumer whether written materials can be sent

4    to work?

5        A.    Not based on the fact situation that you have

6    just established.

7        MR. SEVILLA:  I'm sorry, I may have misunderstood

8    your question.  Is there a policy that -- who was asked,

9    the debtor or the employer?

10       MR. LEMBERG:  He understands the question.

11       MR. SEVILLA:  I need to lodge a proper objection.

12   I need to understand what the question is.  I apologize.

13       MR. LEMBERG:  Well, I don't know.  You can read

14   back the question.

15           (Record was read, as requested.)

16       MR. SEVILLA:  Thank you.

17   BY MR. LEMBERG:

18       Q.    So then I take it your office operates under

19   the assumption that unless someone specifically says,

20   "Do not write me at work," you can write to them unless

21   there's some other reason not to?

22       MR. SEVILLA:  I object.  Again mischaracterizes the

23   evidence.

24       THE WITNESS:  I'm sorry.  Would you either repeat

25   or have the question read back.  There's no problem with

1    it.  I just want to hear --

2    BY MR. LEMBERG:

3        Q.   What I'm trying to understand here is, it

4    appears to me that unless someone -- unless a debtor

5    tells a collector specifically, "Do not write to me at

6    work," anything short of that is interpreted as lack of

7    instruction not to write and, therefore, an implied

8    permission to do it?

9        A.   No.

10       Q.   Explain to me what the policy is.

11       A.   We don't leave our common sense at home when we

12   walk into the office.  If somebody says, "Don't call me

13   at work," then we will check off, "Do not call at work."

14   But we don't need somebody to say, "Do not write me at

15   work," in order to check off the "Do not write me at

16   work."  If anybody said, "I'm not allowed to get

17   communications at work," somebody said -- and again

18   there's too many permutations for me to list them all,

19   but I'm trying to give you an idea.  If anybody said,

20   "I'm not allowed to handle personal matters at work,"

21   something along those lines.

22       Q.   And then which boxes are checked off if

23   somebody says something less than, "Do not write"?

24       MR. SEVILLA:  It's vague.

25       THE WITNESS:  Well, I think I know what you are

1  asking.  And what they would say is not something less

2  than, "Do not write."  It wouldn't be something less

3  than, "Do not call."  It would be something more than

4  "Do not call."  Meaning again -- and maybe I'm not

5  understanding you.  I'm doing the best I can to answer

6  it.

7        If we have reason to believe that either they

8  don't want, they may not have, or it's inconvenient for

9  them to get written stuff at work, we will so document

10  the file, and we will check off that other box.

11  BY MR. LEMBERG:

12      Q.   What is the policy with respect to making

13  inquiry as to whether a consumer is permitted to

14  receive -- either permitted or capable of receiving mail

15  at work?

16      MR. SEVILLA:  Object.  Vague with respect to

17  inquiry.  Go ahead and answer, if you can.

18      THE WITNESS:  I'm going to try and answer your

19  questions, but when you say capable, I assume what you

20  mean is permitted by their employer.  Because the mail

21  goes there, no matter what the rules are.

22  BY MR. LEMBERG:

23      Q.   Okay.  Yes.

24      A.   Okay.  We try and do what we think the consumer

25  wants us to do in that regard.

1    Q.   Is it a policy to ask them directly, "Can we

2  send you a letter at work?"

3    A.   No.

4    Q.   Is there a policy to ask them, "Are you aware

5  of whether mail will be delivered to your work?"

6    A.   No.

7    Q.   Is there a policy of inquiring whether their

8  employer opens all mail regardless of who it's addressed

9  to?

10    A.   Again, with respect to all these questions, in

11  a vacuum, no.

12    Q.   Is there a policy of asking any of the

13  questions that we just discussed as a follow-up question

14  when an employee says, "Do not call me at work" -- a

15  debtor says, "Do not call me at work."  That's compound.

16    MR. SEVILLA:  That's compound.

17    THE WITNESS:  I'm sorry.  My hands are a little

18  squishy with my soup and my cold.  It was a fine

19  question.  Can you restate that question?

20    MR. SEVILLA:  I thought it was compound.

21    THE WITNESS:  Okay.  It wasn't fine.

22  BY MR. LEMBERG:

23    Q.   So your collectors are trained to listen for

24  specific instructions, correct?

25    A.   Yes.

1    Q.   If a debtor gives a specific instruction not to

2  call or write somewhere, your policy is to comply with

3  the instructions?

4    A.   Yes.

5    Q.   This instruction -- but it is not your policy

6  to ask them follow-up questions with respect to at-work

7  correspondence?

8    MR. SEVILLA:  I'm going to object to that as vague.

9    THE WITNESS:  It's our policy to engage the

10  consumer in a discussion to find out information about

11  the consumer, such as -- in compliance with the law, of

12  course -- where they work, where they live, their

13  sources of income, if they own property.  And in that

14  discussion, we are trying to find out information of

15  many sorts about that consumer.  And in that

16  investigation, if we discover that there's a reason why

17  we shouldn't write them at work, then we won't write

18  them at work.

19  BY MR. LEMBERG:

20    Q.   How do you go about discovering --

21    A.   I'm sorry?

22    Q.   How do you go about discovering the reasons why

23  a consumer may not -- it may not be appropriate to write

24  a consumer at work?

25    MR. SEVILLA:  Misstates his testimony.

L.A.  REPORTERS          800-675-9700

517f3755-fc49-40cd-95b9-ea039130fa19

Page 136

1    see if technically Ms. Evon fits into that category.

2    Other than Ms. Evon, no.  And she may have used those

3    terms.  I would have to review a letter or an e-mail

4    that was sent.

5           Q.   Now, going back a second to the account

6    history.  The letter is dated January 14th.

7           A.   Wait one second.  You are talking about

8    Exhibit 3?

9           Q.   Plaintiff's 3 is dated January 14th?

10          A.   Gotcha, yes, sir.

11          Q.   On the 15th at 9:53:46.

12          A.   On January 15th, I see someone named "Star

13   Miller."  Hold on one second.  9:53 -- I'm sorry, the

14   date is 1-15?

15          Q.   1-15.

16          A.   And the time 9:53:46?

17          Q.   Yes.

18          A.   I see what you are referring to.

19          Q.   "Someone has prepared the cover sheet, and a

20   check is requested."  Do you see that entry?

21          A.   Absolutely.

22          Q.   Does the sending of the letter trigger the next

23   step, which is the preparation of the summons?

24          A.   Would you just repeat that?

25          Q.   Does the sending of the letter trigger the next

517f3755-fc49-40cd-95b9-ea039130fa19

1    step in the computer process of the generation of the

2    summons?

3         A.    Maybe I haven't been clear.   Nothing of this is

4    a computer process.   The computer merely records what we

5    have actually done as a memorandum or a documentation.

6         Q.    Okay.

7         A.    The computer does not tell us what to do in the

8    future.

9         Q.    Is it typical for a summons and a cover sheet

10   to be generated the day after a 1033 letter is mailed?

11        A.    Typical?   It's not atypical, it's good.   It's

12   what I would want.

13        Q.    It's what you would strive for?

14        A.    Yeah, I would want something like that.   I mean

15   not necessarily the next day, but within the near

16   future, yes.

17        Q.    The sooner the better, so far as you are

18   concerned?

19        A.    As an employer with systems, you certainly want

20   the system to move smoothly and quickly.   So with

21   respect to that, yes, but it's highly unlikely that the

22   intent is that the Complaint is going to go out in a

23   day.   If that answers your question.

24        Q.    It does.

25        A.    Okay.

517f3755-fc49-40cd-95b9-ea039130fa19

1    Q.   Prior to signing the letter, what -- do you

2  review the account?

3    A.   Yes.

4    Q.   What do you review?  How do you review the

5  accounts?

6    A.   Well, the first thing that happens when it is

7  referred to a collector -- as in this case, I believe

8  Mr. Martinez -- we discussed that earlier -- for

9  potential suit, at the time it went to Ray Welch.  Ray

10  Welch then reviewed it for suit.

11    Q.   What --

12    A.   Ray Welch has more training with respect to

13  what is a good lawsuit, and although he's not a lawyer,

14  he has more training with respect to what is and isn't a

15  good suit for a number of reasons, which if you ask, I

16  will answer.  And Ray would check the computer screen to

17  make sure that we have a good home address.  The reason

18  being is for the correct court to file suit.  He would

19  also check to see if there were any restrictions on

20  where we could send this letter, such as if we are

21  On-Notice not to send the letter to the home or not to

22  send the letter to work.

23        Then some -- there's some other criteria as

24  well -- you know, if they have a job, if they have work,

25  and he would probably verify those.  I say probably,

Page 147

1   because sometimes it would be necessary, sometimes it

2   wouldn't be necessary, depending on what the file

3   indicated.

4        Q.   Okay.

5        A.   I'm sorry, I have got a cold.  I hope I'm not

6   repeating myself.  But I believe I said, he would check

7   to see whether we are On-Notice with respect to

8   anything.  Then he would individually prepare this

9   letter, and he would bring it to me.  I would then

10  review the account with respect to whether or not it is

11  appropriate for a lawsuit in my opinion, because I am a

12  lawyer.  I would determine if I thought we had the

13  correct address.  I would determine whether or not I

14  thought that this was an appropriate investment of my

15  client's money, and an appropriate investment of my

16  time, make sure that somebody didn't miss anything with

17  respect to an On-Notice situation.

18       So in theory we have a double-check

19  redundantly.  I believe this that -- probably I keep

20  repeating myself, you will believe that I believe that.

21       And then I will also make sure that it's the

22  kind of account that I think my client wants me to sue.

23  For example, I know they wouldn't want me suing an

24  account for $200.  And then I will sign this letter.

25       Did I answer your question?

517f3755-fc49-40cd-95b9-ea039130fa19

1    earning withholding hold of some type.  It might be

2    another judgment, or it might be a child support or

3    garnishments that would have priority over ours.

4           And then, assuming that they are employed

5    there, and assuming that there isn't another earning

6    withholding order that would have priority, they would

7    withhold the money, send it to the Sheriff, and the

8    Sheriff would then send it to us.

9           Q.   Incidentally, did you create this 1033 letter

10   form?

11          A.   Yes, I did.

12          Q.   How long ago?

13          A.   I'm going to estimate two years ago.

14          Q.   Have you ever considered, when sending --

15   instead of sending a 1033 letter to someone's place of

16   employment, you could perhaps send it certified mail to

17   their home address?

18          Have you ever considered doing that?

19          A.    Your question is -- I would be happy to

20   answer -- you are asking me a couple different things.

21   The question is asking me have I ever considered serving

22   it certified and have I ever considered sending it to

23   the home.  Because I don't have to, because I could do

24   one or the other.

25          Q.   Well, have you ever considered sending it to

1    A.   My job -- well, that's not true.

2         I didn't say anything.

3         I need to make sure, as best I can, that

4    consumers know what is going on.  And when I say

5    consumers, I'm talking about consumers as defined by the

6    FDCPA.

7         Mr. Lemberg, you know what I'm referring to,

8    correct?

9    Q.   Yes.

10   A.   Okay.  I need to make sure they understand what

11   is going on.  And if I just say a judgment, it's

12   accurate, but it doesn't say what they really need to

13   know.  Because if somebody has a judgment against them,

14   somebody could say, "I have a judgment against me.  So

15   what?"

16        They need to understand, I feel, in deciding

17   what they are going to do, what the effects of a

18   judgment could be.  And I think it's only right to so

19   inform them.

20   Q.   Now, is it true -- my understanding has been

21   that not all wages can be garnished in California.  Is

22   my understanding correct?

23   A.   Well, as a lawyer I'm sure you and I both know

24   that there is -- every time there is a rule, there's an

25   exception to the rule, an exception to the exception, so

517f3755-fc49-40cd-95b9-ea039130fa19

1    Q.   I don't believe we have received the list, no.

2    MR. SEVILLA:  You don't believe you have received

3    the list of his employees?

4    MR. LEMBERG:  I don't believe -- I have seen it.

5    MR. SEVILLA:  You have seen it, but you haven't

6    received it.

7    MR. LEMBERG:  I'm sorry, what did you just say?

8    Q.   Does each one of your employees take an FDCPA

9    questionnaire?

10   A.   No.

11   Q.   Which ones do?

12   MR. SEVILLA:  It's vague.

13   THE WITNESS:  The ones that are going to be

14   collectors or managers of collectors or managers of

15   managers of collectors.

16   BY MR. LEMBERG:

17   Q.   By whom are questionnaires -- by whom are the

18   tests administered?

19   A.   Generally they would be administered by the

20   managers I have identified as floor managers and/or

21   collection managers.

22   Q.   Who reviews them?

23   A.   You mean who reviews the tests and corrects

24   them?

25   Q.   Who marks the tests, yes?

1      A.    One of those two individuals, most likely.   If

2  one of them isn't available or they are busy, it could

3  be Aaron, who is the general manager.

4      Q.    And I take it your office has training

5  procedures set out with respect to compliance with the

6  FDCPA; is that fair?

7      A.    Training procedures with respect to teaching

8  people how to comply with the FDCPA, yes, that's

9  correct.

10      Q.    What -- how are people trained?

11     MR. SEVILLA:   I'm going to object to the word

12  "trained."   It's a formal training -- but whatever.

13  BY MR. LEMBERG:

14      Q.    What sort of formal training do your collectors

15  receive?

16      A.    I'm happy to answer the question.   Sit back and

17  get comfortable.   It's going to be a long answer.

18          Once the person is interviewed and we decided

19  that they might have potential as a collector, they go

20  through two to three days of, I call it formal training,

21  whereby they go through my Collector's Handbook, which I

22  believe you received a copy of.   I see it right there.

23          They go through the FDCPA.   They go through

24  other stuff dealing with collections, because that

25  training is a combination of two different kinds of

1   training.  It's a combination of what the law says you

2   can and can't do, what my policy says you should and

3   shouldn't do, and successful collection techniques with

4   respect to how to deal with people.

5           I always tell everybody the issue is not what

6   you can or what you can't do.  The issue is what you

7   should or you shouldn't do.  I make that very clear in

8   the training.

9           Once they have been through that training, if

10  they seem to get it, they are given an examination.

11  Once they have taken the examination, they have either

12  failed it or passed it.  Generally speaking, if somebody

13  misses five or more, they haven't passed.  And we will

14  make a decision whether or not they are going to get it

15  or they are not going to get it.  If they are not going

16  to get it, we are going to tell them that.  If they are

17  going to get it, we will give them additional training.

18  We go over the issues that they didn't get right so they

19  learn them.  They are retested, and they have to get a

20  passing score.

21          Once they have a passing score and the

22  collection manager thinks they got it -- sometimes even

23  when they get a good score, if the collection manager

24  says, "No, they are not ready.  They are not ready."

25  They are going to go for more training.

1       Assuming the collection manager thinks -- and

2   sometimes Aaron, the collection manager isn't there for

3   some reason, but almost always the collection manager.

4   If the collection manager thinks they are okay and if

5   they pass the test, then they come to me.

6       And I have an individual interview with them

7   that usually lasts about an hour or hour and a half.   In

8   that interview, I go over the exam.   If they have missed

9   questions, I certainly go over the missed questions.

10      I quiz them on things that aren't on the exam.

11  We go through role play.   I pretend to be somebody who

12  they are calling.   Then I have them pretend to be

13  someone who I'm calling.

14      We talk about the areas of law that may or may

15  not be problematic for a collector.   Because some of the

16  FDCPA, you know, is the easiest thing in the world,

17  because the collector never has to deal with them.

18      On the other hand, some of the stuff is a

19  little bit more difficult.   So we go over those things.

20      I harp on them, my policy, which is stated in

21  my introduction, about how I believe that everybody we

22  speak to should be treated with respect.   And you asked

23  me, so I'll tell you.   I tell everybody coming in that I

24  expect everybody they speak to on the phone, even though

25  the person may not be happy that they are getting a

517f3755-fc49-40cd-95b9-ea039130fa19

1  collection call, that they need to treat that person

2  with the same respect they would want their mother,

3  father, sister, brother, husband,  wife, nephew, niece,

4  and any relationship I have forgot, treated as if

5  somebody called them on the phone.

6        As that point in time, if I think they have got

7  it, they will start.  I'm going to call it -- they will

8  start listening to calls.  They won't be on the phone

9  the first day.  They will be listening to calls, hearing

10  how other collectors do it.  If I'm satisfied.  If I'm

11  not satisfied, then one of two things.  Either I will

12  say, "I don't want this person working for me," which

13  very rarely happens at this point because they have been

14  through a lot.  Or I'll say, "This person probably will

15  be okay, but they need more training in this area, this

16  area or this area."  Or I might say, "This person is

17  fine to start listening to calls and eventually put on

18  the phones."

19        And that's just the training that they get up

20  to the first time they are allowed to pick up a

21  telephone.

22        Q.   Do they get any subsequent training following

23  hiring and FDCPA compliance?

24        A.   Absolutely.

25        Q.   What sort of training do they get?

Case 2:09-cv-00760-JAM-KJN   Document 49-3   Filed 05/05/10   Page 69 of 90

1    A.    Most of the training is -- I guess you have to

2    say lecture form, speech form, I don't know.  They will

3    get a certain amount of training one-on-one from their

4    collection managers.  And that is good, but I don't

5    count that.  You know, I assume in my training of them

6    that has never happened.  That is a bonus.  That's

7    great, but I don't rely on that.

8         Several times a week Aaron, my general manager,

9    will talk to them about compliance issues.  And I will

10   also speak to them about compliance issues.

11        And on occasion -- not frequently, but on

12   occasion, we'll have somebody from the outside come in

13   and talk to our people about compliance issues, as well.

14   Q.    When was the last time somebody from the

15   outside came?

16   A.    I would have to guess, but it wasn't in the

17   last few months.

18   Q.    Last year?

19   A.    I think it was about a year ago.

20   Q.    Who was it that came?

21   A.    I'm thinking of -- I can't tell you the exact

22   time, but I'm thinking of a gentleman, Manny Newberger,

23   N-e-w-b-e-r-g-e-r.  Manny Newberger or b-u-r-g-e-r.

24   Q.    Who requested Manny Newberger come to your law

25   office?

517f3755-fc49-40cd-95b9-ea039130fa19

1    A.   Certainly.

2    Q.   Was this training -- did he give out pamphlets

3    or any other pieces of paper to employees at the time he

4    trained them?

5    A.   No.

6    Q.   You just referred, a minute ago, to lectures or

7    other informal training.  Is that documented in any

8    paper form?

9    A.   Some would be, but most of the training I have

10   is ongoing.

11   Q.   And when you say "ongoing," is it scheduled in

12   any way?

13   A.   Not a regular schedule like every Friday at

14   2:00 o'clock I have training.

15   Q.   When was the last time you lectured your staff

16   on FDCPA compliance?

17   A.   Last week.

18   Q.   What was the lecture about?

19   A.   I apologize for my sniffles.  I'm not sure that

20   it would qualify as FDCPA compliance.  Certainly, if

21   they listened to me, they would be compliant with the

22   FDCPA.  Is that what I said the last time?

23   Q.   What did you talk about in your lecture?

24   A.   I was speaking about the fact that -- very much

25   what I just told you a moment ago, that it's not always

1   a question of what you could do, it's a question of what

2   you should do.  It's a question of what you should do.

3           And that just because the FDCPA says we are

4   allowed to do something, it doesn't mean that we should

5   push it to the limit.  I was talking about -- I was

6   talking about something, I talk about a lot, which is

7   building fences.  I use the analogy that -- I'm sorry,

8   I'm slowing down.

9           I was using the analogy that the Grand Canyon

10  has a fence, but the fence at the Grand Canyon is not

11  right at where the Grand Canyon is starting to go

12  straight down, but the fence is built back a little bit

13  because they know the kids are going to be climbing on

14  the fence, and they know that kids are going to fall

15  over that fence.

16          And if they keep that fence a few feet away

17  from the Grand Canyon, the parent can still grab the kid

18  and pull them back.  But if the fence is against -- is

19  right at the Grand Canyon and the kid hobbles over the

20  fence, it's too late.  And I was saying that is the way

21  we need to treat the law, that even though the law let's

22  us go exactly here, maybe we need to take one little

23  step back.

24          So I mean if you define that -- I don't know if

25  that's technically -- yes, it's advice on how to not

517f3755-fc49-40cd-95b9-ea039130fa19

Page 191

1  violate the FDCPA.  I'm not sure if that's actually a

2  lecture on the FDCPA.

3       Q.   Did you mention --

4       A.   You draw your own conclusion.

5       Q.   Did you mention any specific provision of the

6  FDCPA in your lecture last week?

7       A.   I don't think I did last week.

8       Q.   What -- prior to last week, when was the last

9  time that you gave one of these lectures?

10       A.   I'm doing it so often.  I mean, I do it in -- I

11  do very frequent brief ones.  I don't like to go more

12  than 10 minutes.  I think people lose their attention

13  span after about ten minutes.

14       Q.   When you give the lectures, do you talk about

15  any specific provision of the FDCPA?  For instance,

16  today will be a day we will talk about 1692E?

17       A.   I don't use numbers when I do.  Yeah.

18       Q.   Do you remember any lectures that you gave

19  about any specific provision?

20       A.   Sure.  I remember talking a couple weeks ago

21  about when you are allowed to call people other than a

22  consumer, specifically, with respect to when it's

23  permissible to try and obtain location information or

24  confirm location information as defined by the FDCPA.

25       Q.   And when is it permissible?

1  first?

2      A.   It's not been updated since it was originally

3  distributed.

4      Q.   Is a copy of this handbook distributed to each

5  collector?

6      A.   Yes.

7      Q.   Incidentally, do you have -- other than

8  collectors, what staff titles exist in your law office?

9      A.   Titles are rather amorphous but obviously me,

10  the attorney, paralegal and/or paralegals.  Right now I

11  have one paralegal, Mary Molina.  And we have got

12  another employee who I would call clerical staff.  I

13  think that's it.

14      Q.   Does Ms. Molina have legal training?

15      A.   She is not a lawyer, if that is what you mean.

16      Q.   Does she have paralegal training?

17      A.   She has been trained with respect to producing

18  legal paperwork and documents.

19      Q.   She has been trained by your law office,

20  correct?

21      A.   Yes.

22      Q.   When she was hired first, did she have any

23  legal training --

24      A.   Yes.

25      Q.   -- to your knowledge?

1      MR. SEVILLA:  I just want it on the record --

2      MR. LEMBERG:  I'm already committed to the court

3  reporter.

4      MR. SEVILLA:  Fair enough.  I do want to put it on

5  the record that we relied on the seven-hour rule, and I

6  believe -- I agree that you did commit to the court

7  reporter the time you have remaining.

8  BY MR. LEMBERG:

9      Q.  Now, in one section of Mr. Moore's report, it

10  talks about summarizing and he attaches some

11  significance to the concept of summarizing with respect

12  to the On-Notice screen.

13      What is the connection in your practice?

14      A.  Could I see the report -- what you are

15  referring to?  I think I know what you are referring to

16  but I'm not certain.

17      Q.  Without seeing the report, my question is not

18  clear to you; is that true?

19      A.  You are referring to the report.  If you asked

20  me, you know, what is summarizing --

21      Q.  What is summarizing?

22      A.  -- with respect to summarizing.

23      Q.  What is summarizing?

24      A.  With respect to the report, it's hard for me to

25  answer.

Page 217

1        Summarizing is a technique that builds rapport,

2   that hopefully assures accuracy, and that moves a

3   conversation beneficially forward, and encompasses when

4   somebody tells you something, that you summarize it, not

5   necessarily in the same language and repeat it back to

6   them.   And what it does it, A, let's the person know

7   that you are listening to them, because people get very

8   upset if they think they are talking to you, and you are

9   not listening.   And 2, it gives them a chance to correct

10  you if you are wrong.

11       So once you have summarized something in

12  theory, it's more reliable because if you thought about

13  it wrong or misunderstood it or didn't hear it, if you

14  summarize it, it gives them the opportunities to say,

15  "No, that's not what I said."   I think that's it.

16       Q.   What's the relationship between the technique

17  of summarizing and the On-Notice markings that

18  collectors have to make?

19       A.   Well, I don't -- I think it's good summarizing

20  for many, many reasons.   One of them would be, that if

21  someone asks you to do something or not to do something,

22  and you summarize it, and they don't say, "No, that's

23  not what I said," you are safer in believing that what

24  you summarized is accurate.   If you summarized what you

25  believe is so, then you are more likely to believe it as

517f3755-fc49-40cd-95b9-ea039130fa19

1    what is really so.  Does that make sense?

2        Q.   So let's try to do a hypothetical.

3        A.   Ah, ah.

4       MR. SEVILLA:  Run with it for a little while.

5       MR. LEMBERG:  Go off the record.

6       (Discussion held off the record.)

7       MR. LEMBERG:  Back on the record.

8        Q.   With respect to ascertaining whether someone

9    may or may not receive correspondence at work, would you

10    say that the relevance of summarizing is that the

11    collector is supposed to summarize what the debtor said

12    to them in a way that moves the conversation forward --

13    make sure that the collector understands what the

14    consumer said.  Is that the connection?

15        A.   Would you just repeat that for me or have her

16    read it back to me?  I just want to hear it again before

17    I answer it.

18        Q.   Frankly, I didn't really understand it either.

19        A.   Okay.

20        Q.   I will read you the expert's disclosure and see

21    if you can --

22        A.   Okay.

23        Q.   -- shed some light on what is not fair here.

24       "As an age to implementation of the policy

25    procedure, collectors are trained to use summarizing,"

1  finished my sentence.  You read a part of the record

2  that I didn't -- what purports to be our expert's

3  testimony of the defendant, and I didn't get a copy to

4  follow while you were reading, so I'm not able to object

5  as far as accuracy of that reading.

6      MR. LEMBERG:  Object to it's entirety, that's fine.

7      MR. SEVILLA:  Then I still can't represent whether

8  or not what you read is accurate or not.

9      MR. LEMBERG:  Put your objection on the record and

10  we can move forward.

11      MR. SEVILLA:  Fair enough.  It's there.

12      MR. LEMBERG:  Okay.

13      Q.  Can you tell us the relationship between the

14  On-Notice screen and summarizing -- what am I missing?

15      A.  I don't know that you are missing anything.

16  Forgetting about all the rest of the question --

17      Q.  Yes.

18      A.  -- this is a brand new question.

19      Q.  Yes.

20      A.  Okay.  Getting the On-Notice stuff right is

21  something you want to get right.  By summarizing and

22  rephrasing things, it give the party on the other side

23  of the conversation the opportunity to say, "No, you

24  didn't understand me.  That's not what I said."

25          And for the most part you would expect, if you

1  repeat something they say inaccurately, they are going

2  to say, "That is not what I said."

3         So your -- in theory, at the end of this you

4  are going to have a better, more accurate understanding

5  of what was actually said.  I hope that makes sense.

6       MR. LEMBERG:  I have nothing further.  Do you have

7  anything to ask?

8       MR. SEVILLA:  I do, about ten questions, if I may.

9

10                  EXAMINATION

11  BY MR. SEVILLA:

12     Q.   Mr. Mickell, I have to ask you just a short

13  series of questions, probably ten or 11.  And again, I'm

14  not good at math, so I might be talking about 12.

15     A.   That's why we became lawyers.

16     Q.   Let me just admonish you -- I don't want you to

17  talk about your communications with your client at all.

18  If you can't answer my question without having to

19  disclose that, don't answer the question.  So let me

20  know that.

21         Who drafted the 1033 letter?

22     A.   You are talking about Exhibit 3 -- I did.

23     Q.   Did anyone at -- Did any of your clients draft

24  that 1033 letter?

25     A.   No.

```
 1                     REPORTER'S CERTIFICATE

 2

 3        I, CAROLYN ANN PETERSON, Certified Shorthand

 4   Reporter, do hereby certify:

 5

 6        That prior to being examined, the witness in the

 7   foregoing proceeding was by me duly sworn to testify to

 8   the truth, the whole truth, and nothing but the truth.

 9   That said proceedings were taken before me at the time

10   and place therein set forth and were taken down by me

11   stenographically at the time and place therein named and

12   thereafter reduced to computerized transcription under

13   my direction and supervision;

14

15        I further certify that I am neither counsel for

16   nor related to any party in said proceedings, nor in any

17   way interested in the outcome thereof.

18

19        IN WITNESS WHEREOF, I have hereunto subscribed

20   my name in blue ink this date:  April 10, 2010.

21

22

23

24        CAROLYN ANN PETERSON, CSR 3195

25
                                                        228
```

# EXHIBIT C

ORIGINAL

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA


CATHERINE EVON,

        Plaintiff,

VS.

LAW OFFICES OF SIDNEY MICKELL; and
SIDNEY MICKELL, ESQ.; and DOES 1
through 100, inclusive.

        Defendants.

Case No.
1:09-CV-00760-JAM-GGH


DEPOSITION OF JEREMY MICHAEL GESTL

BURBANK, CALIFORNIA

FRIDAY, MARCH 26, 2010


⸱RTED BY:

⸱LYN ANN PETERSON

⸱ɔ. 3195

**L.A. REPORTERS**
Certified Shorthand Reporters
Located in L.A., Beverly Hills, and near LAX
**2112 Century Park Lane, Suite 415**
Los Angeles, CA 90067  www.LAReporters.com
(800) 675-9700   Fax: (310) 277-4941
Court Reporting, Legal Video & Videoconferencing
Complimentary Conference Rooms

1    Q.   What else did you talk about with him?

2    A.   I really don't recall.

3    Q.   Do you recall discussing the substance of

4  the -- any of the taped conversations with Ms. Evon?

5    A.   I don't recall.

6    Q.   You don't recall whether you talked to him

7  about it?

8     MR. SEVILLA:  Asked and answered.

9     THE WITNESS:  I don't recall the content exactly of

10  the meeting with Mr. Moore.

11  BY MR. LEMBERG:

12    Q.   Do you recall -- were you questioned by

13  Mr. Moore about the procedures that you followed with

14  respect to any of the instructions that Ms. Evon was

15  providing during the telephone conversations?

16    A.   Which instructions were those?

17    Q.   "Do not call at work and do not write at work."

18    A.   That did come up, yes.

19    Q.   How did those questions come up?

20    A.   He asked me if I ever remembered her saying

21  don't send anything to her employer.  And I told him

22  that I don't recall that statement ever being made.  I

23  also recall that I repeated back to her a couple of

24  different times in the tape that I understood that she

25  did not want calls at work.

1   BY MR. LEMBERG:

2       Q.   What is the purpose for verifying the

3   employment information in the beginning of the

4   conversation?

5       A.   Quite typically some consumers are permitted

6   calls at work.  We use that contact information.  We

7   also like to verify again -- rather confirm a consumer's

8   reasonable ability to resolve the matter.

9       Q.   What is the purpose for gathering the address

10  of the employer?

11      MR. SEVILLA:  Same question -- asked and answered.

12      THE WITNESS:  In that particular circumstance, I

13  had a difficult time understanding who her employer was

14  and could not find it utilizing the Internet.  I don't

15  believe that -- and when I found a location -- because

16  she didn't know the phone number, I confirmed an address

17  that I had found.

18  BY MR. LEMBERG:

19      Q.   What is the purpose of confirming the address?

20      A.   To list any employment information.

21      Q.   What is the purpose of listing the employment

22  information?

23      A.   It's part of the criteria the client liked to

24  see.

25      Q.   Who is the client?

1    whatnot.

2        Q.    But you didn't ask her for the employment

3    verification line, did you?

4        A.    I was grasping at a phone number that I could

5    reverse so I could get the information that I was asking

6    for.

7        Q.    And what was the information you were asking

8    for?

9        A.    The employment information.

10       Q.    Did you -- do you recall asking her for her

11   phone number at work?

12       A.    Yes.

13       Q.    Did she give it to you?

14       A.    She did not know it.

15       Q.    Now, there's a line there where you say, "I

16   understand.  I don't have to call your employer.  I just

17   have to make sure that you are gainfully employed."

18           Now, that was in response to her request that

19   you not call the employer.  Do you recall hearing that

20   exchange?

21       A.    Yes.

22       Q.    Now, it seems to me that you understood her

23   instruction not to call the employer.  In fact, you

24   acknowledged that you heard it; is that fair?

25       A.    Yes.

e98b9be3-af35-4b7e-babf-ba195a5de4d5

1    BY MR. LEMBERG:

2        Q.    What is the purpose for verifying the

3    employment information in the beginning of the

4    conversation?

5        A.    Quite typically some consumers are permitted

6    calls at work.  We use that contact information.  We

7    also like to verify again -- rather confirm a consumer's

8    reasonable ability to resolve the matter.

9        Q.    What is the purpose for gathering the address

10   of the employer?

11       MR. SEVILLA:  Same question -- asked and answered.

12       THE WITNESS:  In that particular circumstance, I

13   had a difficult time understanding who her employer was

14   and could not find it utilizing the Internet.  I don't

15   believe that -- and when I found a location -- because

16   she didn't know the phone number, I confirmed an address

17   that I had found.

18   BY MR. LEMBERG:

19       Q.    What is the purpose of confirming the address?

20       A.    To list any employment information.

21       Q.    What is the purpose of listing the employment

22   information?

23       A.    It's part of the criteria the client liked to

24   see.

25       Q.    Who is the client?

1   whatnot.

2       Q.   But you didn't ask her for the employment

3   verification line, did you?

4       A.   I was grasping at a phone number that I could

5   reverse so I could get the information that I was asking

6   for.

7       Q.   And what was the information you were asking

8   for?

9       A.   The employment information.

10      Q.   Did you -- do you recall asking her for her

11  phone number at work?

12      A.   Yes.

13      Q.   Did she give it to you?

14      A.   She did not know it.

15      Q.   Now, there's a line there where you say, "I

16  understand.  I don't have to call your employer.  I just

17  have to make sure that you are gainfully employed."

18          Now, that was in response to her request that

19  you not call the employer.  Do you recall hearing that

20  exchange?

21      A.   Yes.

22      Q.   Now, it seems to me that you understood her

23  instruction not to call the employer.  In fact, you

24  acknowledged that you heard it; is that fair?

25      A.   Yes.

e98b9be3-af35-4b7e-babf-ba195a5de4d5

1    and find out if maybe she could borrow those funds.

2        Q.   Now, you do most of the training -- well, is

3    part of your responsibility at the law firm providing

4    FDCPA training to collectors?

5        A.   That is one of my responsibilities.

6        Q.   And so is it fair for me to say that you are

7    well-versed in the FDCPA?

8        A.   Yes.

9        MR. SEVILLA:   Argumentative.

10       THE WITNESS:   I try to do the best I can -- that I

11   can knowing the FDCPA.

12   BY MR. LEMBERG:

13       Q.   Does your law firm have training sessions

14   related to FDCPA compliance?

15       A.   Yes.

16       Q.   How frequently are the sessions held?

17       A.   I believe -- I just had one a couple weeks ago.

18       Q.   Who conducted the session?

19       A.   I did.

20       Q.   And what was the session about?

21       A.   We went over the Fair Debt Act as well as the

22   exam, preparation for that exam.  And the training

23   materials that we have are in our handbook.

24       Q.   Have you -- do you recall attending any other

25   training sessions at the law office?

1       Q.   Now, we had discussed the On-Notice procedures

2   a little bit ago, and I just want to make sure that I

3   understand your practice in that respect.

4       A.   Yes, sir.

5       Q.   If a consumer says, "Do not call me at work,"

6   you are supposed to check off the "work" box and then

7   the "verbal" box, correct?

8       A.   Yes, sir.

9       Q.   And the "letter" box then remains unchecked; is

10  that correct?

11      MR. SEVILLA:   Objection.   Objection, vague as to

12  time.

13  BY MR. LEMBERG:

14      Q.   That's the practice and policy, correct?

15      A.   Can you repeat the question one more time?

16      Q.   When a consumer says, "Do not call me at work,"

17  you are supposed to check off the "letter" box and

18  "verbal" box, correct?

19      A.   Yes.

20      Q.   And if the consumer says to you, "Do not write

21  me at work," you are supposed to check off the "work"

22  box and the "letter" box, correct?

23      MR. SEVILLA:   Same objection.   Same, as to time.

24  BY MR. LEMBERG:

25      Q.   I'm asking you about the standard policy, if

e98b9be3-af35-4b7e-babf-ba195a5de4d5

1   the policy has changed, let me know, or if the procedure

2   has changed, let me know.   But my questions are general

3   in the nature having to do with --

4        A.   I think that to me would be an unusual

5   circumstance.   I would probably not think to ask whether

6   or not they are permitted to receive calls.   If I have

7   adamantly heard that they can't receive written

8   correspondence, it may be a good idea to check mark

9   both.

10       Q.   But as a practical matter, unless they directly

11   state, "Do not write me at work," that box remains

12   unchecked?

13      MR. SEVILLA:   Objection to the form of the

14   question, argumentative, assumes facts.

15      THE WITNESS:   If you could repeat the question,

16   please.

17   BY MR. LEMBERG:

18       Q.   As a practical matter, unless a consumer

19   states, "Do not write me at work," or something that is

20   equivalent of that, the box for "letter" remains -- the

21   box for "letter" with the reference to work remains

22   unchecked, correct?

23      MR. SEVILLA:   Objection.   Move to strike.   Vague.

24      THE WITNESS:   If I'm not -- repeat the question one

25   more time.   I'm sorry.

1                    REPORTER'S CERTIFICATE

2

3        I, CAROLYN ANN PETERSON, Certified Shorthand

4   Reporter, do hereby certify:

5

6        That prior to being examined, the witness in the

7   foregoing proceeding was by me duly sworn to testify to

8   the truth, the whole truth, and nothing but the truth.

9   That said proceedings were taken before me at the time

10  and place therein set forth and were taken down by me

11  stenographically at the time and place therein named and

12  thereafter reduced to computerized transcription under

13  my direction and supervision;

14

15       I further certify that I am neither counsel for

16  nor related to any party in said proceedings, nor in any

17  way interested in the outcome thereof.

18

19       IN WITNESS WHEREOF, I have hereunto subscribed

20  my name in blue ink this date:  April 10, 2010.

21

22

23

24          CAROLYN ANN PETERSON, CSR 3195

25