IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

---oOo---

BEFORE THE HONORABLE JOHN A. MENDEZ, JUDGE

---oOo---

CATHERINE EVON,

       Plaintiff,

vs.                           No. Civ. S-09-760

LAW OFFICES OF SIDNEY
MICKELL; and SIDNEY
MICKELL, ESQ.; and DOES 1
through 100, inclusive,

       Defendants.

_____/

---oOo---

REPORTER'S TRANSCRIPT

MOTION FOR CLASS CERTIFICATION

CROSS-MOTIONS FOR SUMMARY JUDGMENT

WEDNESDAY, JUNE 2, 2010

---oOo---

Reported by:      KELLY O'HALLORAN, CSR #6660

APPEARANCES


For the Plaintiff:


        LEMBERG & ASSOCIATES
        1100 Summer Street
        Stanford, CT  06905
        BY:  SERGEI LEMBERG

        LARA SHAPIRO
        ATTORNEY AT LAW
        4145 Via Marina, #324
        Marina del Rey, CA  90202

For the Defendant:

        DILLINGHAM & MURPHY
        225 Bush Street, Sixth Floor
        San Francisco, CA  94104
        BY:   JOHN N. DAHLBERG
              ANNAMARY E. GANNON
              ANGELITO R. SEVILLA

1          SACRAMENTO, CALIFORNIA

2          WEDNESDAY, JUNE 2, 2010, 9:30 A.M.

3                ---oOo---

4          THE CLERK:  Civil S-09-760; Evon versus Law Offices of

5     Sidney Mickell.

6          Counsel state your appearances, please.

7          MR. DAHLBERG:  Good morning, your Honor.  John

8     Dahlberg from Dillingham & Murphy for defendants.  With me

9     today are my colleagues AnnaMary Gannon, who will be arguing

10    the class certification motion, and Angel Sevilla who will be

11    arguing the motion to reopen discovery which was packaged

12    within the summary judgment motion.  I'm happy to address any

13    questions the Court may have as to the cross-motions for

14    summary judgment.

15         THE COURT:  All right.

16         MR. LEMBERG:  Good morning, your Honor.  Sergei

17    Lemberg for the plaintiff.  And with me is Lara Shapiro.

18         THE COURT:  Okay.  Go ahead and have a seat.  Make

19    sure you keep the microphones in front of you.

20         Let's take up the motion for class certification

21    first, which is somewhat tied to the motion to reopen

22    discovery.

23         Mr. Lemberg, my initial reaction to this motion after

24    reading it, the first obvious question I have is how are you

25    going to in any way get ready for trial?  When is trial set?

1          MR. DAHLBERG:  August 30th, your Honor.

2          THE COURT:  August.  Right.  And don't I have a

3     pretrial conference set in July?

4          MR. DAHLBERG:  Yes, your Honor.

5          THE COURT:  How did you plan to get ready for a trial

6     in August if I granted the motion for class certification and

7     granted the motion to reopen discovery?  How are you going to

8     do that?  You've got to file a pretrial conference statement

9     in July.  I don't understand how you thought you could do

10    that in a class action.  It boggles my mind.  So that's my

11    first obvious question.

12         How are you going to do that?

13         MR. LEMBERG:  The discovery that we seek, your Honor,

14    is --

15         THE COURT:  You can remain seated.  It's okay.  Just

16    make sure we can hear you.

17         MR. LEMBERG:  Is in our mind pretty limited.  And I

18    think that the -- and so we don't think that we need

19    significant additional time to identify, if the Court were to

20    reopen discovery, to identify the documents that we would

21    need in order to go forward with the trial.

22         The history of this case is detailed in the papers,

23    but I think what is important for the Court to know is that

24    the discovery schedule, which was in place in the early part

25    of summer of 2009, contemplated the discovery close in March,

1    end of March of this year.  As a result of the delay that was

2    caused not by us, but by what we believe were either

3    deliberate or inadvertent failures of the defendant --

4          THE COURT:  I saw that argument.  I've read the

5    papers.  I'm not going to get into discovery disputes.  So I

6    don't want to talk about that.  I want you to answer my

7    question.  I don't want a lot of history.  I've read all

8    these papers.

9          MR. LEMBERG:  We need limited documents.  We need

10   documents that establish the assets and liabilities of the

11   law firm if we don't have them.  We don't believe that a

12   negative -- a zero net worth is for us a -- it doesn't kill

13   off the class action or the case.

14         THE COURT:  You claim that each member of the class

15   has the same claims against the defendants and that those

16   claims are susceptible to the same defenses.  And in

17   reviewing your papers, it seems to me that the only thing you

18   know about the other class members is that they got a letter

19   from the defendants.  You don't know anything else about

20   them; right?

21         MR. LEMBERG:  No.

22         THE COURT:  For example, the defendants point out you

23   don't know if they said it's okay to send the letter to work.

24   You don't know if they suffered any damages at all.  You know

25   their name; right?

1          MR. LEMBERG:  Your Honor.

2          THE COURT:  You know their name and you know their

3    address.

4          MR. LEMBERG:  We do know, Mr. Mickell testified, that

5    there was no policy, there is no policy of the law firm of

6    ascertaining whether mail may be transmitted to work.  There

7    is no policy of the law firm to ask the question:  May we

8    send you correspondence at work?  And I can cite your Honor

9    to the pages of the transcript if that's necessary.

10          THE COURT:  I'm focused more on what you don't know

11   about this so-called class.  And there are a number of

12   questions in the defense opposition.  They point out, for

13   example, that you or your client has voluntarily withdrawn

14   her claim for actual damages.  So if she's not seeking actual

15   damages, you still want her to be a representative of a

16   class.  You don't even know if any of these other class

17   members have actually suffered any actual damages.

18          MR. LEMBERG:  We can find that out, Judge.  If they

19   opt out, they choose to pursue their own claims, and they opt

20   out of the -- assuming the class is certified.  But the

21   discovery that we conducted was not directed toward

22   ascertaining whether any of the class members' situations or

23   damages were -- we believe that the act provides for

24   statutory damages.  To the extent it turns out once the

25   notice is sent that folks have individual claims that they

1    wish to bring against the defendants, then they will be able

2    to do that.

3           THE COURT:  Here's the paragraph I was looking for.

4    "Plaintiff has voluntarily waived her claim to actual

5    damages, so only the distribution of statutory damages is at

6    issue.  In determining the amount of the total class award,

7    the Court must consider the frequency and persistence of the

8    collector's noncompliance; the nature of the noncompliance;

9    the debt collector's resources; the number of persons

10   adversely affected; and the extent to which the debt

11   collector's noncompliance was intentional.  The first,

12   second, and fourth factors require individual inquiry.  The

13   only question of fact common to the class is that they are

14   debtors who received a 1033 letter from defendants.  All the

15   other facts necessary to resolve the legal claim that

16   defendants violated the FDCPA are unique to each individual:

17   Is the business address to which each letter was sent a place

18   of employment; did each debtor instruct the defendants to not

19   send correspondence to his or her place of work; were any of

20   the letters opened by someone other than the debtor; did any

21   of the debtors sustain actual injury and, if so, of what

22   nature?

23          "Plaintiff has not demonstrated that there are

24   questions of law or fact common to the class."

25          MR. LEMBERG:  I don't believe that's so, your Honor.

1          THE COURT:  I know you don't believe it.

2          MR. LEMBERG:  I would like to suggest the following.

3     The cases that we cited in our motion and in our reply that

4     follows the opposition which you just read, there are

5     hundreds and hundreds, maybe even thousands of cases in the

6     country where typicality and commonality is found based on

7     form letters that are transmitted.  The only thing that makes

8     this case slightly different is that the letters are

9     transmitted, we contend, to the places of employment.  Now,

10    the defendant does not dispute that that's so.  In fact, the

11    magistrate directed the defendant to produce actual letters

12    that were sent to debtor's places of employment.  And the

13    defendant produced the actual letters that were sent to

14    debtor's places of employment.

15         Now, we do not believe that that section which deals

16    with places of employment is what governs the issue on

17    summary judgment.  We think that what governs it is the

18    transmission of correspondence to third parties, 1692c(b),

19    and therefore it doesn't matter whether the letters were

20    opened or closed.  It doesn't matter how they were marked.

21    What matters is the correspondence was directed to someone

22    other than the debtor themselves.  And we also know in this

23    case --

24         THE COURT:  How do you say that under these facts?

25    I'm looking at the letter.  I've read it several times.  It's

1  directed to Catherine Evon, and it says "personal and

2  confidential," care of Homeq Servicing.  That's not addressed

3  to Homeq Servicing.  It's addressed to Catherine Evon, and it

4  says "personal and confidential."

5          How do you jump from that to this is a letter directed

6  to a third party?

7          MR. LEMBERG:  I think, your Honor, that's the

8  question, I'll be frank, that's the question I anticipated.

9  I think it's a fair question.  The way to answer -- not that

10 you would necessarily need me to say that.  But I think that

11 the way to answer this question is as follows:  The

12 defendants here knew Ms. Evon's address.

13         THE COURT:  Her home address you mean?

14         MR. LEMBERG:  Her home address.  They knew where she

15 lived.  They knew where she received mail.  They did not know

16 whether she received mail at work.  They did not ask her that

17 question.  They did not have a policy of asking questions of

18 this type from anybody.  The letter that was mailed was

19 mailed to the mailing address of her employer.

20         Now, there is no case law, there's really no case law

21 for us to grab onto.  And in my practice, which is

22 significant in the fair debt collection arena, I'll be frank

23 with the Court, I haven't seen anybody else do this.  And I

24 think I know why.  If it's permitted to send correspondence

25 in care of third parties, if the statute allows for that,

1    then the debt collectors just as well could send letters in

2    care of parents, in care of children, in care of places where

3    folks study, in care of their neighbors, in care of their

4    friends.  They have this information.  I have this

5    information, and I have a sample report that we pulled from

6    Mr. Mickell that illustrates they have access to all this

7    information.  So if they can send it to some address where

8    they're not even sure the debtor receives mail, where the

9    debtor did not specifically consent to receive mail, then

10   they can send it to all the other places.

11          THE COURT:  That's not this case.  This is one letter

12   sent to a woman who wasn't responding to their calls, who was

13   avoiding her obligations, her responsibilities, and one

14   letter was sent to her directly that was addressed "personal

15   and confidential."  And from that, you want to make this into

16   a class action.

17          MR. LEMBERG:  We have 262 letters that the defendant

18   produced.

19          THE COURT:  You don't know anything about the other

20   261 letters though.  You don't know anything, other than

21   someone owed a debt and they got a letter that was sent to

22   them at their place of employment, which in and of itself

23   isn't against the law; right?  You'd agree with that?  You

24   can send a letter to a place of employment.

25          MR. LEMBERG:  No, your Honor.

1          THE COURT:  You're shaking your head no.  You think

2    sending a letter -- tell me, because I looked at the statute.

3    Where is a prohibition that says you can never send a letter

4    to the employer?

5          MR. LEMBERG:  Well, the prohibition is in 1692c(b).

6          THE COURT:  I'm looking at it.  Tell me where it says

7    a debt collector can never send a letter to an employer,

8    Because I didn't read that in the statute.

9          MR. LEMBERG:  Well, the word "employer" is not in the

10   statute, but the statute contemplates all kinds of third

11   parties.  The statute governs, this section, 1692c(b),

12   without prior consent of the consumer given directly to the

13   debt collector, or the express permission of a court, or as

14   reasonably necessary to effectuate a postjudgment judicial

15   remedy, a debt collector may not communicate, in connection

16   with the collection of debt, with any person other than the

17   consumer, his attorney, or consumer reporting agency.

18         THE COURT:  Okay.

19         MR. LEMBERG:  We think that the practice of sending --

20   by the way, there's more to this, I think.  The consumer

21   doesn't receive mail.  And most people, at least in my firm

22   and any firm that I've ever worked at and probably -- and

23   again, I may be speculating, but I think on good basis, that

24   most large corporations, the consumers do not receive their

25   mail themselves.  The mail is processed in a central

1    processing facility in most places, as it was for Catherine

2    Evon.  In my firm, we open all mail.  In every place I've

3    ever worked, all mail gets opened, and the mail then is

4    distributed in a centralized way.

5         The statute c(b) is what prohibits debt collectors

6    from communicating with anyone other than the consumer.  And

7    the cases on this have been extremely restrictive.  The cases

8    have mostly dealt with answering machines, and answering

9    machines not of third parties, but of consumers themselves.

10   The debt collector calls and says this is the law office of

11   Sidney Mickell.  This is a message about a debt for the

12   consumer.  The consumer sues saying violation of c(b).

13        THE COURT:  Let me stop you.  Because again, I mean

14   you started out this argument with this is all speculation.

15   This is about whether you should be allowed to proceed in

16   this lawsuit as a class action, whether you've satisfied the

17   requirements of Rule 23.  And as you can tell from my

18   questions, I think you've got some real serious problems

19   meeting the requirements of Rule 23.  Part of your case, not

20   part, the gist of your case is dependent on this letter

21   itself which you say any reading of this letter clearly shows

22   that it's a violation of the FDCPA.

23        And again, I'll be straight up with you.  I looked at

24   this letter, and either we're reading two different letters

25   or you're just hoping that a court would see it differently.

```
1    One, I don't see any threats at all in this letter.  You use

2    the word "threats" over and over again.  I wish you'd show me

3    where there is a threat in this letter, because I see the

4    word "could."

5          And you cite a number of cases where certain letters

6    have been found to be in violation of the act.  And in

7    reading those cases and looking at those letters compared to

8    this letter, I mean it's so easily distinguishable to me that

9    I can't find any merit in your argument that the letter

10   itself violates anything in the FDCPA.  And that's part of

11   your argument that since this letter was sent to 262 people,

12   all these people were improperly threatened by this law

13   office.

14         So tell me where there's a threat.  And you have to

15   read the letter in its totality.  Everybody agrees.  Tell me

16   where there's any threat at all in this letter.

17         MR. LEMBERG:  Your Honor, I have two initial

18   observations.  First, the letter is coming from the law

19   office.  And letters coming from law offices under a number

20   of cases, including a case called Avila in the Seventh

21   Circuit, are interpreted, and Clomon in the Second Circuit,

22   two cases which are widely followed, are interpreted on the

23   highest standard.  And the reason for that, in the Seventh

24   Circuit's words, is that the debtor knows that the price of

25   poker has gone up and they're bound to be sued.  And so
```

1    courts look at these letters more carefully and interpret

2    them more stringently.

3          The second observation is that the standard that

4    applies here is the "least sophisticated debtor" standard.

5          THE COURT:  I agree.  I'm looking at this as the

6    "least sophisticated debtor."  And tell me where there's any

7    threat at all in this letter.

8          MR. LEMBERG:  The bolded section, your Honor, that

9    begins with:  "According to California law, a judgment

10   against you, among other things, could result in remedies

11   such as wage garnishments, bank account levies, or

12   attachments of your assets, as well as accrue interest at the

13   legal rate of 10 percent."

14         THE COURT:  All that could happen.  There's nothing

15   false or misleading about that statement.  It doesn't say it

16   will happen.  It doesn't say once we obtain judgment, these

17   things will happen.  All it's saying is, look, pay your debt

18   or all these things could happen.  Right?  That's what it

19   says.  I circled the word "could."  In fact, three times I

20   circled the word "could."

21         MR. LEMBERG:  The conditional nature of the statement

22   doesn't change it.

23         THE COURT:  Why not?

24         MR. LEMBERG:  Because it doesn't, in the eyes of the

25   least sophisticated consumer, your Honor, the word "could"

1    doesn't mean what it means to us.  They're getting a letter

2    at their place of employment from an attorney.  They're

3    seeing the words capitalized, bolded and capitalized, wage

4    garnishments, bank account levies.  The cases that we have

5    cited to you --

6             THE COURT:  Where is your evidence of that?  I know

7    you cited me cases.  Where is your evidence of that?  In

8    fact, the evidence in this case really cuts against you since

9    your own client admitted that she didn't see it.  And I know

10   you told me that I shouldn't take that into consideration and

11   I can't take that into consideration.  But tell me that

12   wouldn't speak volumes to a jury if your own client gets up

13   on the stand and says I didn't see this as threatening in any

14   way, I didn't see it.

15            So if your client isn't the least sophisticated

16   debtor, then how can she represent the class?  I guess I'm

17   coming back full circle to you want this to be a class

18   action, but your client isn't that person; right?  You've got

19   the wrong person.

20            MR. LEMBERG:  The client can represent the class even

21   if she understood.

22            THE COURT:  She's going to kill the class when she

23   takes the stand and says that.

24            MR. LEMBERG:  I don't think so, your Honor.

25            THE COURT:  Well, I know you don't think so.

1          MR. LEMBERG:  She subjected herself to an eight-hour

2     deposition under oath and under videotape.  So I think she'll

3     be a -- she like everybody else, like all jurors, has a

4     difficult time paying her bills.

5          A couple of responses to your Honor's questions.  The

6     first one, if the client is not the least sophisticated

7     consumer, can she represent the class.  The answer is yes.

8     Throughout the country everywhere, including one of the cases

9     in which the defendant relied, where the plaintiff was a

10    lawyer and the judge concluded that notwithstanding the fact

11    that the plaintiff is not the least sophisticated consumer

12    and was not at all duped by the letter, that does not change

13    the least sophisticated consumer standard.

14         The second point is that there is no evidence here

15    that, and there need not be any because it's a question of

16    law, as to whether this person, Catherine Evon, was duped by

17    the threat of wage garnishment.  She wasn't asked these

18    questions, your Honor, at deposition.  She was asked whether

19    she understood that these things could happen after a

20    judgment, and her answer was yes.

21         THE COURT:  If you're really going to use words like

22    "threat," you and I aren't going to communicate very well.

23    Look, I mean the reality is you're not going to convince me

24    that there's any threat whatsoever in this letter.  I can't

25    find it.  I don't see it.  It's my obligation to review this

1    letter in its totality.  I've looked at it upside down,

2    sideways, and every which way.  I can't see anything other

3    than this is a letter that's informing somebody of possible

4    consequences if they don't pay $6,837.35.  Unfortunately for

5    your client, it's honest, it's truthful, and these are all

6    the things that could happen to her.  It's doing her a

7    service, although I know you don't see it that way.  I

8    understand she got herself into a situation.  But ignoring

9    phone calls from debtors, not paying debts, all could result

10   in all the things that this letter says.

11        I don't want to talk any further.  I've read the

12   papers.  Let me ask Ms. Gannon if there's anything else that

13   you want to add that's not already in your papers, because

14   obviously I'm prepared to rule on the motion for class

15   certification.

16        MS. GANNON:  Unless the Court has any questions, your

17   Honor, I don't think I could add anything to what you've

18   already done.

19        THE COURT:  All right.

20        MS. GANNON:  Or said.  Excuse me.

21        THE COURT:  Let me then rule as follows.  As we've

22   discussed, there are a number of requirements for class

23   certification.  Under the Federal Rules of Civil Procedure

24   23, there are four threshold requirements.  One, numerosity,

25   a class so large that joinder of all members is

 1   impracticable.  Commonality, questions of law or fact common

 2   to the class.  Typicality, that the named parties' claims or

 3   defenses are typical of the class.  And adequacy of

 4   representation, that representatives will fairly and

 5   adequately protect the interests of the class.  In addition

 6   to satisfying Rule 23(a) prerequisites, parties seeking class

 7   certification must show that the action is maintainable under

 8   Rule 23(b)(1), (2), or (3).

 9        The Ninth Circuit's recent en banc decision in Dukes

10   vs. Wal-Mart Stores clarified the standard that the district

11   court should use when deciding class certification.

12        First, when considering class certification under

13   Rule 23, district courts are not only at liberty to, but

14   must, perform a rigorous analysis to ensure that the

15   prerequisites of Rule 23 have been satisfied, and this

16   analysis will often, though not always, require looking

17   behind the pleadings to issues overlapping with the merits of

18   the underlying claims.  It is important to note that the

19   district court is not bound by these determinations as the

20   litigation progresses.

21        Second, district courts may not analyze any portion of

22   the merits of a claim that do not overlap with the Rule 23

23   requirements.  Relatedly, a district court performs this

24   analysis for the purpose of determining that each of the Rule

25   23 requirements has been satisfied.

1          Third, courts must keep in mind that different parts

2     of Rule 23 require different inquiries.  For example, what

3     must be satisfied for the commonality inquiry under Rule

4     23(a)(2) is that plaintiffs establish common questions of

5     law, and answering those questions is the purpose for the

6     merits inquiry, which can be addressed at trial and at

7     summary judgment.

8          Fourth, district courts retain wide discretion in

9     class certification decisions, including the ability to cut

10    off discovery to avoid a mini-trial on the merits at the

11    certification stage.

12         Fifth, different types of cases will result in

13    diverging frequencies with which the district court will

14    properly invoke its discretion to abrogate discovery.

15         In terms of the numerosity requirement, 23(a)(1)

16    requirement, there are no absolute numbers that must be met,

17    but classes of less than 30 will rarely satisfy numerosity,

18    and classes of over a hundred or more almost always will

19    under Ninth Circuit cases.

20         Plaintiff has identified, as we discussed, 262

21    potential class members based on letters obtained.

22    Defendants have argued that numerosity is not satisfied and

23    that plaintiff is a class of one.  They have argued that

24    while many people were sent the same form letter, plaintiffs

25    have offered no evidence that the business addresses on the

1    letters were places of employment, or that any of the

2    proposed class members instructed defendants not to send

3    letters to their workplace.

4         At this stage as to that element, numerosity does

5    appear to be satisfied.  And plaintiff's proposed class would

6    include those without permission of the consumer.  That's the

7    language that they use.  Plaintiff proposes actually the

8    following class:  "All consumers to whom a letter from the

9    defendants in the form of or substantially similar to the

10   letter was sent, on or after March 24, 2008, to an address

11   within the state of California at, or in care of, the

12   consumer's place of employment, without permission from the

13   consumer."

14        Plaintiff seeks to be named the class representative

15   and to have her attorneys, Mr. Lemberg and Ms. Shapiro,

16   appointed as class counsel.

17        Let me move to commonality.  That requires that there

18   is questions of law or fact common to the class.  It focuses

19   on the relationship of common facts and legal issues among

20   class members.  All questions of fact and law need not be

21   common to satisfy the rule.  The existence of shared legal

22   issues with divergent factual predicates is sufficient, as is

23   a common core of salient facts coupled with disparate legal

24   remedies within the class.  The commonality test is

25   qualitative rather than quantitative.  One significant issue

1   common to the class may be sufficient to warrant

2   certification.

3          Plaintiff has alleged that all potential class members

4   share ten common questions.  All the questions center around

5   whether defendants violated the FDCPA.  Five of the ten

6   questions deal with whether the language of the form letters

7   violates the FDCPA.  One of these questions appears to the

8   Court to no longer be applicable.  Question 4 asked whether

9   defendants violated the FDCPA by threatening to file a

10  lawsuit if the debt was not paid in full, without intending

11  to institute such a proceeding.  The defendants' opposition

12  demonstrated that they had, indeed, filed a lawsuit against

13  plaintiff and against other recipients of the letter.  In her

14  reply brief, the plaintiff denied ever alleging that

15  defendants did not intend to file a lawsuit.

16         Four of the questions deal with whether the act of

17  sending the letters to plaintiff's workplace violated the

18  FDCPA because the letters constituted third-party

19  communication, were sent to an inconvenient place, or were

20  sent without permission.

21         And then the last question dealt with whether

22  plaintiff and the class are entitled to restitution and what

23  the proper measure of damages or restitution should be.  In

24  plaintiff's reply brief, plaintiff raised for the first time

25  this issue of window envelopes.  And the defendants in

1    response to that filed a motion for relief.  I'm not going to

2    take up that issue.  I didn't really see the reply,

3    plaintiff's reply brief, as raising that issue as one of the

4    class requirements.  I think simply they were trying to point

5    out that that may be evidence in this case.  As defendants

6    point out, though, there is no evidence yet, at least that I

7    saw, that all 262 people, the proposed class, received window

8    envelopes.

9         So it's really a nonissue at this point.  I think it

10   was just pointed out by the plaintiffs as a possible issue

11   that could come up.  So I'm not going to rule on the

12   defendants' request since it's not going to in any way affect

13   the Court's decision.

14        With respect to the commonality issue, the defendants

15   have argued that plaintiffs have not satisfied this

16   requirement.  They've argued that the common issues, the ten

17   issues lack merit.  Defendant argues that there are also many

18   factual issues that are unique to plaintiff, and that she's

19   failed to show that other class members also share these

20   facts, such as that she called to tell defendants not to

21   contact her at work, that defendants' employee made the

22   mistaken notation in plaintiff's file, that plaintiff's

23   employer opened plaintiff's letter, and other issues that

24   defendants have raised.

25        As to the commonality issue, I do find that the

1   questions regarding whether the language of the letters

2   violated the FDCPA, since it was the same identical letter,

3   would be common questions of law.  Whether the mere act of

4   sending a letter to a person's workplace violates the

5   prohibition on third-party communication would also be a

6   common question of law, assuming the business addresses were

7   the workplace addresses, an issue that the defendants have

8   called into question.  However, there are questions of fact

9   that are not necessarily common to all potential class

10  members.  Some members may have given permission to send

11  letters to their workplace.  Some, like plaintiff, may have

12  specifically asked that communication not be sent to the

13  workplace.  Thus, these questions, and the corresponding

14  damages inquiry, are not necessarily common questions.  And

15  as for the new allegation raised concerning the window

16  envelopes, as I've indicated, the Court will not consider

17  these allegations since they were raised for the first time

18  in the reply.

19          In short, some, but not all, of the questions are

20  common questions.  The commonality requirement is a close

21  issue.  And on the commonality issue, because of the

22  questions of fact and the differences in the questions of

23  fact that defendants have raised, I don't find that, in fact,

24  the plaintiffs have satisfied this requirement.

25          But it's not really the gist of the Court's decision

1    on this motion, because the next requirement is typicality.

2    And that requires that the claims or defenses of the

3    representatives are typical of the claims or defenses of the

4    class.  Representative claims are typical if they are

5    reasonably coextensive with those of absent class members.

6    They don't need to be substantially identical.

7         The plaintiff is alleging that each member of the

8    class was sent a letter substantially identical to

9    plaintiff's letter, and plaintiff alleges that each member of

10   the class has the same claims against defendants, and that

11   those claims would be susceptible to the same defenses.

12        Defendants argue that they have a defense or defenses

13   to plaintiff's claims, including a bona fide error defense,

14   which is unique to her.  Defendants argue that because

15   plaintiff called and instructed them to contact her at work,

16   plaintiff's letter was mailed to her workplace as a result of

17   human error.  The point is that this is a unique defense, and

18   defendants have argued that this, among other things, show

19   that typicality has not been met.

20        Plaintiff has offered nothing to show that other class

21   members also called or wrote to instruct defendants not to

22   mail letters to their workplace.  Thus, that could be a

23   defense that's not typical to the class.  Plaintiff's

24   allegation that all class members have the same claims and

25   are subject to the same defenses is not well supported in

1    this motion, because the only information that the Court has

2    before it regarding the other class members is that they got

3    a copy of a letter identical to what Ms. Evon received.  The

4    claims related to the language of the letter may be typical,

5    but that's not enough, in the Court's view, to meet the

6    typicality requirement in this case.

7           And, finally, and what I think is particularly

8    decisive, is that 23(a)(4) permits certification of a class

9    action only if the representative parties will fairly and

10   adequately protect the interests of the class.  This requires

11   that the proposed representative plaintiff does not have

12   conflicts of interest with the proposed class and that the

13   plaintiffs are represented by qualified and competent

14   counsel.

15          Plaintiff has argued that she does have the desire and

16   ability to fairly and adequately pursue this case and

17   represent the class.  She argues that her decision to drop

18   her state law claim and waive her damage claim, as well as

19   the fact that she's filed for bankruptcy, doesn't make her

20   unfit to serve as a named plaintiff.  She also alleges that

21   there's no indication that her interests may conflict with

22   class interests.  And her counsel assert that they are well

23   qualified in FDCPA and consumer litigation and have filed

24   class action lawsuits before.

25          Defendants have argued the plaintiff is not an

1    adequate class representative and that class counsel is not

2    qualified.  Defendants have produced evidence as follows:

3    That plaintiff, in fact, dropped her state law claim.  She

4    waived her claim for actual damages.  And defendants have

5    argued that this shows she is not protecting the interests of

6    the class.  Defendants have also argued that plaintiff's

7    counsel are not qualified to represent the class.

8         And on this requirement, I am concerned that this is

9    an attorney-driven action.  And while there's been much

10   discussion about how defendants have frustrated discovery,

11   have caused issues, I don't see this as a well litigated

12   class action case.  That concerns me.  That's my first big

13   concern.

14        When the complaint was originally filed, this was an

15   individual claim.  Ultimately counsel decided that they

16   should pursue this as a class action, and an amended

17   complaint was filed I believe sometime -- correct me if I'm

18   wrong -- but it was around July of 2009.

19        MR. DAHLBERG:  Yes, your Honor.

20        THE COURT:  We now sit here almost a year later and,

21   frankly, if, as you obviously were entitled to do, if you

22   decided that it was best to pursue this as a class action, I

23   think the first thing you should have done, Mr. Lemberg, is

24   ask the Court for a reconsideration of its scheduling order.

25   Because there is no way possible that you could get ready if

1    I granted this motion to certify for trial in August.

2    There's absolutely no way you could do that.  It would be a

3    disaster.  And I know you think differently, but based on my

4    experience, the first thing you should have done is ask that

5    the scheduling order be modified, that you set up a briefing

6    schedule for the motion to certify the class.

7         This is the first class action I've ever seen where

8    I've received both a motion to certify the class and a

9    summary judgment motion on the same day.  I've got to tell

10   you I've never seen this done.  It's just not done.  It's got

11   to be done in an orderly fashion if you are going to have a

12   class action.  And I don't have that in this case, and that

13   causes me great concern.

14        And second, as I've indicated, I don't think that your

15   client is the best representative for this class.  And so

16   under that element as well, I don't think that certification

17   would be appropriate.

18        I'm not going to get into the (b)(2), 23(b)(2) and

19   (b)(3) requirements, since it's clear that I have no

20   intention of granting the motion to certify.

21        In short, plaintiff has elected to propose a class,

22   and common questions include whether or not permission was

23   given to send the letter to the workplace and whether this

24   triggered other violations of the FDCPA.  There is no

25   information regarding the last element of plaintiff's

1   proposed class, whether the letters were sent to the place of

2   employment "without permission from the consumer."

3   Therefore, while 262 letters were sent, it is unknown how

4   many, if any, of these letters were sent to an address

5   without a class member's permission.  Whether or not

6   permission was given affects not only the number of potential

7   class members, but also whether or not certain provisions of

8   the FDCPA were violated.  Because of this, plaintiff does not

9   meet her burden to show that the commonality and typicality

10  requirements are met.

11          Furthermore, counsel's lack of experience with class

12  actions and, more specifically, counsel's litigation and

13  handling of the litigation in this case, in this Court's

14  view, does make them inadequate to represent the class.  Even

15  if I had decided to certify the class, I would have required

16  that plaintiff's counsel find cocounsel who have handled

17  class action litigation from start to finish similar to

18  what's before this Court.

19          For all those reasons as to the motion to certify the

20  class, the Court is denying the motion in its entirety.  I'm

21  not going to reach the issue of reopening discovery since it

22  goes hand in hand with the motion to certify.  So that motion

23  is denied as well.

24          I just had one of these motions a while ago, similar

25  to this case, in which I also denied the motion for class

1    certification.  And that case was similar to this case, in

2    that I thought and felt that really this action, at least the

3    request to turn this into a class action, was generated

4    primarily by the attorneys.  And there's a Ninth Circuit case

5    that holds that "because the only persons likely to benefit

6    from a class action in this case are class counsel, a costly

7    and time-consuming class action is hardly the superior method

8    for resolving the dispute."  That's In re Hotel Tel. Charges,

9    500 F.2d 86, 91, a Ninth Circuit 1974 case.

10              I think that is applicable here.  I don't think that

11   anyone stands to benefit from a class action other than class

12   counsel.  And so I'm refusing to grant the motion.

13              All right.  I want to turn to the cross-motions for

14   summary judgment.  Both sides agree, and we should confirm,

15   that Count 7 is now withdrawn; is that correct?

16              MR. DAHLBERG:  Yes, your Honor.

17              THE COURT:  Okay.  And so we're left with six counts.

18   In terms of the instructions that were or weren't received,

19   I've seen the two transcripts, reviewed the tape recording.

20   And, Mr. Lemberg, just so I'm clear, it is your position that

21   your client did tell them don't send me any letters, don't

22   send me anything at my place of employment, or words to that

23   effect?  That's her position; right?

24              MR. LEMBERG:  The position is that she said that and

25   that she said don't call me at work.

1          THE COURT:  Okay.

2          MR. LEMBERG:  And that Mr. Gestl said I understand

3     that you don't want me to call you at work, but, but, but,

4     the rest of the conversation goes.

5          THE COURT:  Okay.  And I'm not sure, but are

6     defendants admitting that, in fact, they received that

7     instruction?

8          MR. DAHLBERG:  Not in the sense that Mr. Gestl

9     understood it.  I think there is a basis to argue that when

10    you have the transcript or you have the call in front of you

11    and can listen to it, some people hear those words.  But

12    Mr. Gestl's declaration is unambiguous that he didn't hear

13    the instruction as do not send.  He heard and summarized it

14    back to the plaintiff as do not call.

15         THE COURT:  And those two answers just confirm my view

16    that when I read these cross-motions and I get to that issue

17    in particular, I don't see any way to resolve that as a

18    matter of law.  I really don't.  That issue, which concerns a

19    number of the causes of action, is a genuine issue of

20    material fact that only a jury's going to be able to resolve.

21         But let me be more specific about each of these

22    motions.  As to the plaintiff's motion, plaintiffs are

23    seeking summary judgment on the issue of liability.  And

24    there are, as I said, six remaining claims.  I want to go

25    through each of these.

1              The first claim is the alleged violation of 15 USC

2      1692c(b).  It's a provision which prohibits communication

3      with third parties in connection with the collection of any

4      debt, unless it is directed toward the consumer, his or her

5      attorney, a consumer reporting agency if otherwise permitted

6      by law, the creditor, the attorney of the creditor, the

7      attorney of the debt collector, or is done with the

8      consumer's consent or by leave of the court.  Plaintiff has

9      alleged in this claim that the letter that was sent to her

10     place of employment constituted an unlawful communication

11     with a third party in an attempt to collect a debt.

12             And the statute itself reads as follows.  It's

13     entitled "Communication with Third Parties."  "Except as

14     provided in Section 1692b of this title, without the prior

15     consent of the consumer given directly to the debt collector,

16     or the express permission of a court of competent

17     jurisdiction, or as reasonably necessary to effectuate a

18     postjudgment judicial remedy, a debt collector may not

19     communicate, in connection with the collection of any debt,

20     with any person other than the consumer, his attorney, a

21     consumer reporting agency if otherwise permitted by law, the

22     creditor, the attorney of the creditor, or the attorney of

23     the debt collector."

24             And we discussed on just this claim itself the issue

25     of whether this was, in fact -- I mean it is a communication,

1    but whether this was, in fact, a communication with a third

2    party.  The facts, again, are pretty much undisputed in this

3    case.  The letter did go to the plaintiff at her place of

4    employment.  There's a triable issue of fact as to whether

5    she said don't send it to me or not.  And I think, just so

6    defendants don't go down this path, I also think there's a

7    real triable issue of fact as to your defense that this

8    was -- I can't remember what language you used, but a bona

9    fide error, or -- you know, that is a defense available to

10   you, but I clearly think that that's not one that I can

11   resolve as a matter of law either.  There's too many facts in

12   dispute as to that defense.

13        So setting aside that defense, the issue is whether

14   this was a communication with a third party in connection

15   with the collection of any debt.

16        Mr. Lemberg, as I indicated in my other questions, I'm

17   having trouble seeing that this was, in fact, a communication

18   to a third party.  I don't think the law, as I read it and

19   read that statute, absolutely prohibits the sending of a

20   letter like this to an individual at their place of

21   employment.  And there is no evidence, despite your beliefs

22   as you've indicated or your speculation, that most mail sent

23   to places of employment are opened by the employer and that,

24   in effect, the defendants knew that that was likely to occur.

25   That's all speculation.  I don't have that type of evidence.

1    And, in fact, in this case, the evidence seems to be to the

2    contrary, that it wasn't the practice of this employer to

3    open employee's mail.  And, in fact, they apologized, as I

4    understand it, to your client for doing so, for opening a

5    personal and confidential letter.

6         Given those facts in this specific case, how are you

7    claiming you can still make that a violation of 1692c(b)?

8         MR. LEMBERG:  I think, your Honor, the weight of

9    authority of cases decided under 1692c(b) is that any actual

10   or potential exposure of debt-related communications to third

11   parties violates the section.  Any direct communication with

12   a third party or any indirect communication with a third

13   party.  Here it is undisputed that the defendant sent a

14   letter to her place of employment, that the letter was

15   opened, and that the letter was accessed by someone other

16   than the debtor.

17        THE COURT:  Wouldn't your case be stronger, though, if

18   the letter was, in fact, addressed to Homeq Servicing, Watt

19   Avenue, and then at the bottom it said "attention Catherine

20   Evon," as opposed to this letter which is addressed only to

21   your client, it's marked "personal and confidential," and

22   it's a care of letter, but it's still addressed to her and

23   not to Homeq Servicing?  You don't think that makes a

24   difference?

25        MR. LEMBERG:  I think the mere fact that, despite that

1    language in the letter, that it was opened, illustrates why I

2    think our argument is valid under c(b).  There is no

3    guarantee that Homeq Servicing or anybody else provides for

4    their employees that their mail will remain private.  And in

5    this case, despite the warning "personal and confidential,"

6    it was opened, delivered to the legal department, viewed by

7    several persons there, and then delivered to the plaintiff.

8    I think that the communications directed to work, to third

9    parties, are prohibited notwithstanding any label that may be

10   put on the envelope, on any warning that may be included in a

11   voice mail message left on an answering machine.

12        THE COURT:  Do you think there is at least a triable

13   issue of fact or any triable issue of fact on this claim?

14        MR. LEMBERG:  I think, your Honor, that the facts are

15   before the Court.  The inference and the legal significance

16   of the facts is what's at issue.  But whether the

17   communication was -- the mere fact that it was accessed by a

18   third party is enough to impose liability under c(b).

19   Whether there is a defense to that, whether --

20        THE COURT:  What if it hadn't been opened by the

21   employer?  Does that make a difference?

22        MR. LEMBERG:  Not in my view, your Honor.

23        THE COURT:  Okay.

24        MR. LEMBERG:  It's directed to a mailing address at

25   which the -- the letter is directed to a mailing address to

1    which there is no consent to receive mail.  They could have

2    sent it to me.  They could have sent it to the neighbor.  If

3    they are permitted, if debt collectors are permitted to dun

4    at addresses where they cannot show the consumer receives

5    mail, then they can dun anywhere.  In this case, they dunned

6    at work.  In another case, they can dun at school.  They can

7    dun parents.  I don't believe that -- and the personal and

8    confidential label, incidentally, that was lifted from a

9    different section of the law dealing with whether putting

10   something on the envelope itself reveals to third parties

11   that the communication is about a debt.  And there were cases

12   out there that said look, putting "personal and confidential"

13   on the envelope suggests that it's about a debt, and the FTC

14   came out and said no, that's okay.  Putting "personal and

15   confidential" doesn't reveal anything about the contents of

16   the letter.  So I don't think that label has anything to do

17   with whether the letter is permitted or prohibited.  I think

18   we have to look at the language of the statute which governs.

19        And I want to bring to your Honor's attention, with

20   respect to the bona fide error defense which came up just a

21   second ago, Mr. Gestl at deposition confirmed that he

22   understood the instruction, that he -- the question was:

23        "Now, it seems to me that you understood the

24   instruction not to call the employer.  In fact, you heard it.

25   Is that fair?

1          "ANSWER:  Yes."

2      That's on page 78 of the transcript.

3      THE COURT:  I want to make sure I understand your

4  argument.  Are you saying that under the facts of this case,

5  this was a direct communication with a third party, or are

6  you arguing this was an indirect communication, but even if

7  it's indirect, it's still prohibited by the statute?  What

8  argument are you making?

9      MR. LEMBERG:  I'm arguing both, your Honor.  I'm

10  arguing that it's mailed in the hands of the employer with

11  the request to deliver the piece of mail to the employee.  So

12  it's directly mailed to the employer.

13      THE COURT:  The statute doesn't say mail.  It says

14  communications.

15      MR. LEMBERG:  Exactly.  It's communicated to the

16  employer, the third party.  But even if it's not direct, it's

17  certainly an indirect communication in that it's

18  communication to both, the person who receives the mail, the

19  recipient, saying look, here's this personal and confidential

20  communication to somebody else, and it's a communication to

21  our client.

22      THE COURT:  The statute says -- let me read it again.

23  "A debt collector may not communicate, in connection with the

24  collection of any debt, with any person other than the

25  consumer."  Right?

1          MR. LEMBERG:  Correct.

2          THE COURT:  Everybody agrees that's the language.  And

3     this is a letter addressed to Catherine Evon, but you're

4     saying that doesn't make a difference.

5          MR. LEMBERG:  Catherine Evon does not receive mail --

6     she happened to get this piece of paper in her hands, but

7     there is nothing to establish that Catherine Evon receives

8     mail at work.

9          THE COURT:  Do you agree with that, Mr. Dahlberg?

10          MR. DAHLBERG:  No, your Honor.  And may I say by way

11     of preface that all of plaintiff counsel's remarks about the

12     handling of this letter are not reflected in the record.

13     There is no declaration from Ms. Evon or anyone at her

14     workplace to discuss how this letter was handled.  These are

15     simply statements of counsel, which under Catrett are not

16     sufficient to withstand summary judgment.  We do know that

17     she gave testimony, but she was not actually a witness to the

18     handling of this letter.  Her testimony, which I'm happy to

19     paraphrase, was that she was on vacation when the letter was

20     received.  So she doesn't know anything about how the letter

21     was handled.  I'm sorry, your Honor.  I lost track with my

22     preface of your Honor's question.

23          THE COURT:  Well, it's really your argument as to why

24     you think that judgment should be granted in your favor on

25     this claim.

1          MR. DAHLBERG:  Well, very simply, your Honor, I think

2     my colleague, Mr. Lemberg, states that there's no case law

3     supporting the Court's leanings in this case, but, in fact, a

4     case that the plaintiff relies on from the Southern District

5     of New York, Sluys vs. Hand, actually Judge Broderick there

6     went to the trouble of differentiating between a carbon copy

7     of a letter to a debtor sent illegally to the employer and a

8     letter which was merely sent "personal and confidential" at

9     work to the employee.  And that's at page 326.  That is a

10    dividing line with regard to Count 1 that is significant.

11         THE COURT:  Why did your client send it to this place

12    though?  If your client knows the home address of Ms. Evon

13    and your client's asked that question -- I assume he was in

14    his deposition -- why did they do it?

15         MR. DAHLBERG:  Your Honor, I don't have my client's

16    deposition in mind, but I believe the answer goes like this:

17    That debtors frequently find it easier and more expeditious

18    to deal with these communications in the workplace during

19    business hours when they have access to telephones, and many

20    may find it embarrassing to deal with these issues at home in

21    front of spouses or significant others and children.

22         THE COURT:  So they choose to send it to place of

23    employment as opposed to home?

24         MR. DAHLBERG:  I can't say that that's true in every

25    instance, your Honor.  I can simply say that that I believe

1    is justification that Mr. Mickell has offered for why he does

2    it.  It's not meant to invade anyone's privacy.  He's gone to

3    great lengths to assure that privacy is respected, as the FTC

4    1988 comments reflect.  And if we're going to get into things

5    off the record, this is the one and only time anyone's ever

6    complained about it.

7              THE COURT:  Does it make a difference, do you think,

8    Mr. Lemberg, that this is a one-time letter?  The only

9    evidence in this case is this is the only letter that was

10   sent to your client.  Does that make any difference at all?

11   It's not a case where there's 10, 12 phone calls and 15

12   letters or along those lines.  Does that make any difference

13   at all?

14             MR. LEMBERG:  Your Honor, in this economy, people's

15   work, and the reason Catherine Evon isn't here today is

16   because she's afraid to take a day off and lose her job.

17   People lose jobs for a variety of reasons.  And their work is

18   what they -- it's their means to pay their bills and put food

19   on the table.  So I think that communicating -- the statute

20   is set up to forbid debt collectors, with some certain

21   limited exceptions, from communicating with third parties.

22             The decisions around the country, circuit court and

23   district court decisions, the weight of authority is that --

24   there was a decision that just came out of the Fourth Circuit

25   where the Fourth Circuit said look, there's no constitutional

1    right to leave messages that could be overheard by third

2    parties.  And even if it's difficult to convey communications

3    relating to a debt without leaving a message, so be it.

4         And so I think that the fact that this letter was sent

5    at work and that others such as this were sent to debtor's

6    places of employment, the fact that Mr. Mickell on page 106

7    of the transcript was asked:

8            "Is there a policy to ask them directly can we send

9    a letter at work?

10           "ANSWER:  No.

11           "Is there a policy that says I want you to question

12   the consumer as to whether or not they can receive mail at

13   work?

14           "No."

15        The fact that the law office is set up this way makes

16   this not exceptional or sort of an oddball case.  It makes

17   the policy egregious, particularly egregious, which is why

18   I'm here in California rather than New York.  It's not

19   because I enjoy litigating cross-country.  It's because I

20   think this policy of sending letters to places of employment

21   is particularly egregious.

22        THE COURT:  Okay.  We're going to take a break so the

23   court reporter can have a short break.  And I recognize I

24   still have another matter.  When we come back, I want to have

25   both parties respond to a practical question.  And that is

1   given that I'm not certifying this, I'm not certifying the

2   class, this proceeding as an individual case, and apparently

3   that your client has waived her right to actual damages, why

4   are we going forward with this case as a practical matter?  I

5   leave you with that question.  You both can answer it after

6   the break.  We'll come back in ten minutes.

7           (Recess taken.)

8           THE COURT:  All right.  Back on the record.  I left

9   both parties with a question.

10          Mr. Lemberg, do you want to attempt to answer my

11  question?

12          MR. LEMBERG:  Your Honor, may I take two minutes to

13  address one aspect of the Court's decision?

14          THE COURT:  No.

15          MR. LEMBERG:  Then the answer to the Court's question

16  is that if certification is not granted, the individual claim

17  for the statutory damages survives subject to the defense of

18  bona fide error, if that survives.  I understand the Court's

19  views on whether the --

20          THE COURT:  Statutory damages are a thousand dollars

21  though; right?

22          MR. DAHLBERG:  Right.

23          THE COURT:  So the most you can recover is a thousand

24  dollars?

25          MR. LEMBERG:  The most we can recover is a thousand

1    dollars, plus the congressional mandate of attorney's fees

2    and costs in litigation.  So that would be what survives.

3         MR. DAHLBERG:  Your Honor.

4         THE COURT:  Mr. Dahlberg, go ahead.

5         MR. DAHLBERG:  Yes, your Honor.  Thank you.  We did

6    have a discussion in the hallway about whether it made sense,

7    given the Court's ruling thus far and the Court's comments on

8    the record, simply to continue this hearing a few days so

9    that the parties can discuss a resolution given the economics

10   of the case.  One party thought it made sense to go forward.

11   One party thought it made sense to continue.

12        THE COURT:  Obviously I've read all this stuff.  I'm

13   prepared to give you a decision on the cross-motions for

14   summary judgment and let you know what I think actually does

15   survive if this case does proceed to trial.

16        What I've identified and I think defendants have

17   identified as claims 2 and 3, I call them the "e" claims,

18   they focus on the contents of the letter itself and whether

19   those violate either 15 USC Section 1692e(4), which is the

20   plaintiff's second claim, or 15 USC Section 1692e.

21        And so the record's clear, plaintiff's motion for

22   summary judgment, as I understood it, really focused, it was

23   a motion for partial summary judgment, focused on the first

24   claim, which we talked about, the 1692c(b), and then the

25   1692e claim.  It's sort of interesting that you have broken

1    up your complaint in that way.  I understand you have an e(4)

2    claim and then an "e" claim.  But I took the motion for

3    summary judgment, I think the defendants did as well, as

4    focusing only on claims 1 and 3.

5          My view of claim 1, the 1692c(b) claim, is that there

6    are genuine issues of material fact that prevent this Court

7    from resolving that claim on summary judgment for either

8    side.  That is a case that has issues, factual issues, that

9    prevent this Court from granting judgment for either side on

10   that claim, including, you know, the simple issues of did

11   she, in fact, communicate to defendants that she did not want

12   anything sent, any communication sent to her at work -- I'm

13   speaking of the plaintiff -- that she didn't want any

14   communication with her at her place of employment, what

15   happened after the letter got to her place of employment, and

16   other issues, including issues going to certain defenses

17   raised by the defendants, whether this was, in fact, just a

18   bona fide or excusable error on the part of the defendants.

19   Those are issues that I can't resolve and I think need to get

20   to the jury.

21         On claims 2 and 3, which really focus on the contents

22   of the letter, the plaintiffs really only focus on their

23   third claim.  That's the 1692e claim which prohibits any

24   false, deceptive, or misleading representation or means in

25   connection with the collection of any debt.  Again, I want to

1    get the statute itself.  Section 1692e, 15 USC Section 1692e,

2    is entitled "False or Misleading Representations."  And it

3    provides that:  "A debt collector may not use any false,

4    deceptive, or misleading representation or means in

5    connection with the collection of any debt."  And then within

6    the "e" section, there are subsections.  But the overall

7    section prohibits the use any false, deceptive, or misleading

8    representations.

9         And under that statute and based on the evidence

10   before the Court, I am prepared to deny plaintiff's motion

11   for summary judgment in her favor and actually grant summary

12   judgment on that claim.  As my comments have indicated, I

13   don't see any evidence in this case that what the defendant

14   did involved false, deceptive, or misleading representations.

15   That letter is accurate in every respect.  And it's phrased

16   in such a way that it doesn't contain any of the type of

17   threats that were found to have violated that statute in the

18   cases relied on by the plaintiff, as opposed to the case

19   cited by the defendants.  Actually it was in their opposition

20   to plaintiff's motion.  It's a case that I thought was more,

21   the facts at least were closer to the facts of the case

22   before the Court than any other case.  And that's the Higgins

23   case, Higgins vs. Capitol Credit Services, Inc.  It's

24   actually a District of Delaware case from 1991, 762 F.Supp.

25   1128.  But in that case there was a letter which contained

1    language such as:  "We are preparing a power of attorney to

2    file suit.  If this is approved, it could result in an

3    attachment of your personal property and/or wages at

4    Chrysler."  And in this case, in the Higgins case, the

5    plaintiff, like the plaintiff in the case before this Court,

6    asserted that this violated the FDCPA, and the court

7    disagreed.

8        Again, I understand that I'm required to and I have

9    applied the "least sophisticated debtor" standard.  But this

10   letter from defendants in no way, at least in this Court's

11   view, violates the FDCPA.  I understand that debtors don't

12   like to be contacted by debt collectors, but you can't

13   completely tie the hands of debt collectors, and at least the

14   companies that hire debt collectors have still some rights to

15   try to collect their debt.  I think this letter is among the

16   better letters that I've seen in terms of letting someone

17   know who is deep in debt that these are things that could

18   happen to you.

19       And again, I don't find in any shape or form in

20   looking at this letter in its totality that it contains

21   anything that comes close to being false or deceptive,

22   misleading or threatening, that word I've heard several

23   times.

24       So I would deny, as I said, the motion for summary

25   judgment that plaintiffs have brought in its entirety, and I

1   would grant the motion for summary judgment as to the "e"

2   claims, both claims 2 and 3, the e(4) claim and the "e"

3   claim, causes of action 2 and 3, in defendants' favor.

4           As for the remaining claims, claims 1, 4, 5, and 6,

5   and as I've indicated, the record should reflect that claim

6   7, the violation of 1692c(a)(3), has been withdrawn by the

7   plaintiff.  As to those claims, 1, 4, 5, and 6, again, I

8   don't find at this stage that I can grant summary judgment in

9   defendants' favor given that I think there are genuine issues

10  of material fact that affect both the defenses and the claims

11  themselves.

12          The defendants have argued that they have no liability

13  for these four claims, raising, in effect, four issues.

14          First, that they're protected by 15 USC

15  Section 1692c(c).  I would indicate I have serious doubts

16  that there is much merit to that defense.

17          Second, that plaintiff admitted at deposition that her

18  employer did not forbid employees from receiving such

19  communications at work, despite the allegation made in the

20  complaint.

21          Third, that sending the letter to Ms. Evon at her work

22  is not a prohibited third-party communication because it was

23  sent with the words "personal and confidential" on a sealed

24  envelope.

25          And, fourth, this bona fide error.

1          As to those, at least third and fourth arguments

2    raised by defendants, there are too many genuine issues of

3    material fact, including what did Ms. Evon say to the

4    defendants exactly, if she was clear that she didn't want any

5    form of communication sent to her at work.  Does that give

6    rise?  I don't know the answer to that.  Again, I can't

7    resolve that factual dispute.  But would that, in effect,

8    give rise to some liability on the part of the defendants

9    since they went ahead and sent her this letter anyway?  And

10   if they did go ahead and do it anyway, did they really do it

11   only because of a bona fide error?  There's a lot of issues

12   as to what actually went on.  Although granted, there wasn't

13   a lot of evidence in opposition, as the defendants point out,

14   to the undisputed facts concerning the bona fide error, there

15   still at least was enough in my view to allow those claims to

16   go forward.

17        So for purposes of the summary judgment motions, I'm

18   denying plaintiff's motion or partial motion for summary

19   judgment and I'm granting the defendants' motion for summary

20   judgment as to claims 2 and 3 and denying it as to claims 1,

21   4, 5, and 6.

22        As to all the decisions made by the Court today, I'm

23   going to ask defense counsel, Mr. Dahlberg, if you'd prepare

24   orders, run them by Mr. Lemberg for approval as to form,

25   submit them to the Court, and I'll sign them.

1          I have one other issue that I want to bring up which

2     plaintiffs, to their credit, did not make a big deal of, but

3     really concerns me, Mr. Dahlberg.  I don't want to get into

4     all the issues that occurred during discovery, but one of the

5     things that you sought apparently was a protective order

6     protecting confidential information.  And the plaintiffs bent

7     over backwards to comply with that, yet you filed briefs that

8     just put this information out in the open.  That really

9     bothers me when you make plaintiffs jump through hoops, not

10    you but your client -- well, actually you're the one that

11    requested on behalf of your client, and then you just go

12    ahead and you don't give them a call and say don't worry

13    about it, go ahead and submit it.  And so what I'm really

14    getting to is giving you an opportunity as to why I shouldn't

15    impose sanctions against you for making them jump through

16    hoops when they didn't have to jump through hoops.  And they

17    had to spend a lot of extra time complying with a protective

18    order that you just decided when you filed your briefs to

19    ignore.  I don't get it when people fight so hard to keep

20    things confidential and then you just file it without even

21    following your own protective order.

22         MR. DAHLBERG:  Well, your Honor, I certainly

23    acknowledge that that is a problem, and I'll explain it this

24    way.  When we received the discovery which had been served on

25    prior counsel, the wheels had already been started simply to

1    get a confidentiality order in place that both sides could

2    use.  We certainly had to protect and have protected the 200

3    plus letters and the identity of the debtors.  With regard to

4    failing on the day we filed our opening briefs to protect,

5    for example, Mr. Mickell's procedures manual, that was

6    strictly my fault.  We were running out of time and trying to

7    meet the deadline to file.  So I have to say it was in the

8    nature of oversight.  But when plaintiff was asked simply to

9    enter into a garden variety protective order, that was not

10   meant in bad faith, and it's a standard thing that a

11   defendant would request.

12        THE COURT:  Yeah, but my point is no one gave him a

13   call and said don't worry about the protective order.  And

14   they went ahead and still submitted things in redacted form

15   and then submitted it in a confidential manner.  And I'm

16   assuming that took extra time.

17        MR. LEMBERG:  Your Honor, my associate spent the

18   weekend at some point trying to figure out, first of all,

19   what to do.  One more issue.  And I don't like these sorts of

20   things, and we inserted a little piece in the brief about it.

21   But we contacted Mr. Dahlberg to seek permission to state the

22   number of letters.  Just the number.

23        THE COURT:  Right.

24        MR. LEMBERG:  Susan Schneiderman in my office wrote

25   him an email saying may I do this.  The answer was I have to

1    check with the client.  And ultimately the answer was not

2    provided for us.  So a protective order is a hassle.  Most of

3    the documents that were here, frankly, went out to the world.

4    They were not confidential.

5               THE COURT:  Right.

6               MR. LEMBERG:  They were either received from third

7    parties or went out to the world.  And our view was rather

8    than spend the time fighting the designations, we would spend

9    the time complying with the order.

10              THE COURT:  So what I'm going to do is allow you to

11   submit a declaration with supporting documentation as to how

12   much time you think you spent, extra time you spent complying

13   with the protective order.  Submit that to me within the next

14   ten days.  Mr. Dahlberg, I'll give you an opportunity to

15   respond to it.  Then I'm going to issue an order in which you

16   likely should be prepared to pay some money to the

17   plaintiffs, unless I find really good cause for what

18   occurred, for the extra time they had to spend in compliance

19   with the protective order, because I think a phone call

20   easily could have resolved a lot of this.

21              So I'd leave everyone with those orders.  We have a

22   pretrial conference coming up in July.  You have time to talk

23   as to how you want to proceed with this case.  And we'll

24   obviously talk further at the pretrial conference as to

25   whether this, in fact, is going to proceed to trial or not

1    given what I see is a limited amount of damages that may be

2    recoverable.

3              Any other questions?  When is the pretrial conference?

4              THE CLERK:  July 14th.

5              THE COURT:  See you on July 14th then.  Okay.

6              (Proceedings were concluded.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I certify that the foregoing is a correct transcript

2     from the record of proceedings in the above-entitled matter.

3

4

5                         /s/ Kelly O'Halloran

6                         KELLY O'HALLORAN, CSR #6660

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25